Robert Michael PURTELL, Appellant,

v.

The STATE of Texas, Appellee.

No. 69498.

Court of Criminal Appeals of Texas, En Banc.

Nov. 2, 1988.

Rehearing Denied Dec. 7, 1988.

Kenneth N. Tarlton, Mineral Wells, for appellant.

N.A. Irsfeld, Dist. Atty., Palo Pinto, Robert Huttash, State's Atty., Austin, for State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death. We affirm.

The appellant was convicted of intentionally causing the death of John Basham in the course of committing and attempting to commit the offense of robbery. The appellant raises twelve points of error. He challenges the sufficiency of evidence to support the finding that the murder was committed in the course of robbery or attempted robbery; the exclusion for cause of four prospective jurors; the admission into evidence of an extraneous offense; the exclusion of evidence of the deceased's homosexuality; the admission in evidence of photographs of the victim; the prosecutor's jury argument regarding facts not in evidence; the admission of psychiatric testimony at the punishment stage; and, finally, the failure to define "deliberately" in the court's charge to the jury on punishment.

In his first ground of error, appellant argues that the evidence was insufficient to support the "in the course of robbery" element of the of the offense. On February 6, 1984, John Basham left his home in Dublin, Texas to attend a conference of Methodist ministers at S.M.U. He drove in his Volkswagen camper, and was to be joined later in Dallas by his wife. Apparently, Basham never reached the conference. Pursuant to their plans, Mrs. Basham went to Mr. Basham's parents' home in Fort Worth. Mr. Basham was to pick her up and then drive the two of them back to the conference. After Mr. Basham was an hour over due, Mrs. Basham became concerned that something had happened to her husband. She sent her son, who also lived in Fort Worth, to the conference to inquire about Mr. Basham. His inquiries revealed that Mr. Basham had not been seen at the conference. Mr. Basham's family notified the police that he was missing. Announcements were made at the conference and on television that Mr. Basham was missing and requested anyone with information to contact the police.

On February 10, Cecil Holifield, a constable in Palo Pinto County, noticed a Volkswagon camper on the shoulder of Interstate 20, near Gordon. Because he had noticed it the day before and it fit the description of Mr. Basham's camper which had appeared in that day's newspaper, Con-

stable Holifield stopped to investigate. Looking in a window, Holifield saw a body in the back of the camper. Without disturbing the scene, he radioed for the Palo Pinto Sheriff's Department.

Sherriff's deputies secured and photographed the scene. Next, they conducted a crime scene investigation, dusting for fingerprints and collecting items of evidence. At this point they noted that Mr. Basham's pants pockets had been turned inside-out. In a line moving west, away from the camper, deputies discovered a trail of items which appeared to be from Mr. Basham's wallet. These items included Mr. Basham's driver's license, a photograph, an I.D. card with Mr. Basham's name, a twenty dollar bill, newspaper clippings, business cards, and a piece of a wallet.

After investigations at the scene of the camper's discovery were completed, the camper was towed and impounded at the Sheriff's Department. The next day, officers from the Fort Worth Police Department conducted further investigations of the camper, and the body was sent to the Southwestern Institute of Forensic Sciences.

On March 13, 1984, Det. Gary Davis and Lt. Richard Lorenzano were working on a permanent sting operation for the Phoenix Police Department in Phoenix, Arizona. On that day, they met with appellant and Dale Carrasquillo, appellant's accomplice, concerning a deal in which the officers were to purchase a stolen automobile from these two men. During the course of their recorded conversation, appellant and Carrasquillo told the officers about a murder that they had committed in Texas. Relevant portions of that conversation state:

Carrasquillo: It [the murder] happened in Texas on the highway.

Davis: Oh, okay.

Carrasquillo: You see somebody tried to get cute.

Appellant: We found out ... we found out....

Carrasquillo: That he had some bucks on him, mucho bucks, and uh we followed the fag. S'we cleaned him off, we [tape inaudible] out in Ranger and we brought him up on the highway. My brother [1] drove and I took care of him from there and that was it.

Davis: You shoot the bastard or what?

Carrasquillo: No man, took one of those little fucking hand axes at him and hit him right across the head.

Davis: What kind of ax?

[tape inaudible]

Carrasquillo: Little, fucking two pound axes, wham, right in the head. That was it. Covered him over.

Davis: Kind of fucking messy ain't it, man?

Carrasquillo: No man, this wasn't messy at all. I got a few spots on my pants [inaudible interruption] but that was it, man.

Davis: Wow ... Jesus Christ.

\*   \*   \*   \*   \*   \*

Carrasquillo: The thing was stuck in his head.

Appellant: I like what it done to his shorts.

Davis: You just left it in his head? Boy, that's cold, man. You could have at least taken the ax out of his fucking head. Man ... shit. Shit, maybe they did.

Carrasquillo: Yeah, we scored $2,500 off that. Yeah, I don't give a fuck.... [interrupted by Davis]

\*   \*   \*   \*   \*   \*

Appellant: This guy just started sticking, he just started sticking me and we ain't even said nothing, we ain't let him on yet that we were going to beat him, you know what I mean. This guy was trying to get sick.

Davis: Well you, well you, you was gonna, you was gonna [inaudible interruption by appellant] beat him up and take his money anyway?

Carrasquillo: Yeah, strong arm him ... just rob him.

---

1. At this time, appellant and Carrasquillo were know to the officers by the aliases Steve and Chris Radcliffe, respectively.

Davis: Why did he start stabbing you, you ain't got no idea?

Appellant: Got to be, he got the hint.

Davis: Oh.

The next day, Davis and Lorenzano went to a motel room shared by appellant and Carrasquillo in order to finalize a murder for hire arrangement that was first mentioned during their meeting on March 13. The tape recording of that conversation reveals, in relevant part:

Davis: Last night you told me about ... you'd done that kind of shit before [murder]. Called a friend of mine in Dallas. Asked him—anybody get killed down there with a hatchet lately. He said, "man, I ain't heard of nothing." So he checked around and shit—nothing.

Carrasquillo: Well, you tell him somebody got whacked.

Appellant: That somebody's dead. Was a man. That's all, and I got two marks on my back. [inaudible]

[?]: Right there.

Appellant: They're fresh. The guy stuck me in the back and we killed him. That's all

Carrasquillo: He probably hasn't heard of anything ...

Davis: [interrupting] You see, let me....

Carrasquillo: It was on the highway. We don't even....

Appellant: It's outside—it's outside of Dallas. That's all we know.

Davis: What do you mean, outside of Dallas?

Carrasquillo: It was outside of Dallas on the, on the highway.

Appellant: Uh, the point—we met this dude in one of these bars in downtown Dallas, right, and, uh, you know, we told him we lived out, you know, near Fort Worth and he said, "Okay, I'll give you a ride out there." We got on the highway, man, we start doing it up and that was that. Fucking pulled the van over, got out of it, and left. We just kept on walking.

Davis: Maybe you didn't kill the dude.

Appellant: Oh—

Appellant and Carrasquillo simultaneously: He was dead.

Appellant: He shit his britches. That dude was stoned, we we we, I sat there for half an hour. He didn't move. That's dead.

Davis: I understand.

Appellant: Jaw was over here. Eyes was left wide open. I threw a pink blanket over him—got out of the van.

Davis: Well you see the reason I asked. I've done a lot of sub-contracting with a lot of people. Probably out here in the Southwest, I've got—had a lot of 'em done. Used to do a lot of 'em my own self. You always like to get references —cause I'm gonna tell you. You've geen there. You know after you done iced somebody, people get strange, see. So you don't ever go hiring some fucker to do it unless you kind of check out where he's been, see—to make sure the dude's really been there. That's the only kind of—makes me uneasy about it. I call my buddy in Dallas, and says, "Hey, hey check on this for me," and uh—he didn't hear nothing. So, maybe it was so long ago, that I thought maybe that's why nobody remembered it.

Carrasquillo: Maybe it got filed as, uh, a simple robbery/murder [word inaudible] was thrown away. Nobody's....

Davis: Yeah, could be some shit, yeah. You, you said it was about three months ago?

Appellant: Uh, huh.

Carrasquillo: Yeah, it was about three months ago.

Appellant: You're the first one we've ever said anything to, you just don't go talking about that shit.

Davis: I understand, I understand.

After this conversation, law enforcement officials in Texas were finally able to confirm to Davis that a murder had occurred much as described by appellant and Carrasquillo. After receiving this information, the officers in Phoenix decided that they should arrest appellant and Carrasquillo at their next meeting with them. Det. Davis, was taking some vacation during the time of the next meeting; therefore, the arrest

was made by Lt. Lorenzano and Det. Timothy Cooning, also assigned to the Phoenix undercover sting operation.

In weighing the sufficiency of the evidence, this Court must determine whether a rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–2, 61 L.Ed.2d 560, 576–7 (1979); *Marras v. State*, 741 S.W.2d 395, 400 (Tex.Cr.App.1987). Appellant' sole challenge to the sufficiency of the evidence is that proof was inadequate that the murder was committed in the course of committing or attempting to commit robbery. See V.T.C.A. Penal Code, § 19.03(a)(2). Therefore, our review of the evidence will be limited to this issue.

■ Evidence at the scene of the crime suggested that the murder was in the course of a robbery. In the camper, Basham's pockets were turned out and there was a trail of materials taken from Basham's wallet, leading away from the camper. This trail suggests that Basham's wallet was taken and that its contents were searched as someone walked along the road. The path that was taken by whoever searched the wallet was the same route that appellant and Carrasquillo admitted taking as they left the camper.

Conversations between appellant, Carrasquillo, and Det. Davis suggest that the murder was committed during the course of a robbery. During the first taped conversation, Carrasquillo indicated, at three different points, that the murder was part of a robbery. Appellant ratifies these remarks when he surmises that Basham began to stab him was because he "got the hint" that he was to be robbed. During the second taped conversation, Carrasquillo refers to the crime as a "robbery/murder."

Finally, cross examination of appellant during trial suggests that he and Carrasquillo possessed money for which appellant could not account. The prosecutor questioned appellant about the amount of money he had when he left home. He asked appellant about each stop made before arriving in Phoenix. After adding together money which appellant and Carrasquillo received and deducting their expenses, there was a surplus.

Based on all of this evidence, we hold that a rational trier of fact could have found, beyond a reasonable doubt, that appellant killed John Basham in the course of robbing him. Appellant's first point of error is overruled.

In points of error eight, nine, ten and eleven, the appellant claims that four members of the jury panel were erroneously excluded for cause. Both appellant and the State group these points of error. While conceding that the veniremen in question disagreed with death penalty and expressed concern that their personal views would affect them in fulfilling their oaths, appellant argues that they were actually "wavering jurors" who never definitively stated that they would be impaired in their roles as jurors. The State argues that appellant failed to object to these jurors' dismissals and that their statements were clear enough to warrant the trial judge's rulings on the State's submissions for cause. We will discuss each venireman individually, grouping these points of error when common issues of law predominate.

■ If an appellant does not object when a venireman is excused for cause, he may not challenge that ruling on appeal. *Guzmon v. State*, 697 S.W.2d 404, 412 (Tex.Cr.App.1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1479, 89 L.Ed.2d 734 (1986); *Boulware v. State*, 542 S.W.2d 677, 682–83 (Tex.Cr.App.1976). Although cases decided by this Court are in complete agreement on this point, they do not set out what would be a proper objection in this context. Application of *Zillender v. State*, 557 S.W.2d 515 (Tex.Cr.App.1977), however, will illuminate this omission. In order to perfect an issue for appeal, an objection is "required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it." *Zillender*, supra at 517. In

addition, the objection should "afford opposing counsel an opportunity to remove the objection or supply other testimony." *Id.*

During the voir dire of Carla Ragsdale, the venireman discussed in point of error eight, the State elicited statements which indicated that Ms. Ragsdale opposed the death penalty. At the end of direct examination, the prosecutor said "Your Honor, I will challenge and pass the witness at this time." Appellant's counsel next cross-examined the venireman and questioned her about whether her beliefs would prevent her from answering the special issues honestly and based on the evidence presented. The final question and answer were:

Q: Now, even—you'll be able to follow this law even though you know that the —that the consequences of you doing your duty and following the law may in fact be the imposition of capital punishment? And this is tough, we certainly sympathize with you, Mrs. Ragsdale. And this is a question that I am asking in all sincerity, can you follow the law and can you do your full—fulfill your duty as a juror based upon the law of the State of Texas?

A: Yes. I think I could.

MR. TARLTON: Okay. Your Honor, we will pass the witness back. We think that she's stated sufficiently that she can follow the law as given to her by the Court at the punishment stage of the trial.

The State further directed the witness and appellant further cross-examined. At the end of the State's redirect, it reurged its motion to dismiss the venireman. At the end of his recross, appellant did not restate his position that the witness could fulfill her oath as a juror. Appellant's examination ended as follows:

Q: You feel like that even if the Judge instructs you on the law, do you feel like that you could follow his instructions and decide this case based on the evidence that is presented at the second stage of the trial?

A: No. I'm still opposed to the death penalty.

THE COURT: Anything further, sir?

MR. TARLTON: No, sir.

THE COURT: Your challenge will be sustained....

■ Appellant's first statement would have been adequate to preserve error on appeal. Given the context of the questions, the State's challenge, and appellant's assertion that the venireman had "stated sufficiently that she can follow the law as given to her by the Court at the punishment stage of the trial," the trial judge was informed that appellant was resisting a challenge for cause under *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985). However, when appellant elicited an unfavorable and unequivocal answer to his final question and then told the trial judge that he had nothing further, appellant created the distinct impression that he was abandoning his opposition to the motion to dismiss for cause. At that point, the trial judge did not know that he was to rule on a *contested* point. Appellant's previous "objection" failed to achieve the functions set out above; therefore, it was ineffective to perfect this issue for appeal. Although the context of voir dire and the nature of the questions asked fully informed the judge that the parties were involved with the issues raised in *Wainwright v. Witt*, supra, it did not convey to the trial judge that appellant continued to oppose the State's motion. Appellant's eighth point of error is overruled.

In point of error nine, appellant argues that Sharon Maitland was erroneously dismissed for cause. The State first examined Ms. Maitland. After discussing her views on the death penalty and how they might affect her as a juror, the prosecutor "submit[ted] the juror for cause." Appellant then briefly attempted to rehabilitate the venireman. After his final question, the following transpired:

MR. CREIGHTON: Nothing further.

THE COURT: All right, sir.

MR. SMITH: Your Honor, we submit the juror.

THE COURT: All right, sir. Your challenge will be sustained.

Appellant at no time asserted a belief that this juror was qualified to sit nor did he

resist the State's motion. Point of error nine is overruled for the reasons stated in point of error eight.

In his tenth point of error, appellant argues that venireman Thomas Like was improperly excused for cause. The State elicited responses from the venireman indicating that he was intractably opposed to the death penalty. After direct examination, the State challenged for cause. Appellant vigorously cross-examined the venireman about whether his feelings would impair his ability to follow the law. The State began redirect without any comment from appellant as to the venireman's qualifications. After the State's redirect, the prosecutor reurged the trial judge to dismiss the juror. Appellant did not attempt to recross the witness and did not indicate that he opposed the State's motion. Appellant, thus, failed to object in a manner which would have informed the trial judge that appellant was opposed to the State's motion. Point of error ten is overruled.

In point of error eleven, appellant argues that venireman Michael Allen was erroneously dismissed for cause. The State elicited responses from the venireman on direct examination that his opposition to the death penalty would likely prevent him from considering the death penalty. At the end of direct examination, the State challenged the venireman for cause. Appellant responded that he had no questions for the venireman and the judge granted the State's motion. Appellant at no time gave any indication that he opposed the motion and made no attempt to rehabilitate the venireman. Because appellant failed to object, he has waived this issue for appeal. Point of error eleven is overruled.[2]

In his sixth and seventh points of error, appellant argues, respectively, that the prosecutor improperly related details of extraneous offenses to the jury during opening argument and that Det. Davis improperly testified to the details of an extraneous offense. Appellant relies on the general rule that extraneous offenses are inadmissible and argues that none of the ac-cepted exceptions apply to these offenses. The State counters that the offenses are relevant to show the context in which appellant's admissions of committing a murder in Texas occurred.

Prior to opening arguments, appellant made a motion to exclude all mention of extraneous offenses. The trial judge partially granted the motion, allowing mention only of extraneous offenses which occurred in connection with prior statements and taped conversations of the appellant. The trial judge specifically noted that appellant would not be given a running objection as to these matters, but that subsequent objections which referred to this motion would be considered as having set out the grounds stated in the motion. Appellant's counsel stated that he understood and accepted this arrangement.

■ At trial, at least three instances occurred in which the jury's attention was called to the extraneous offenses. During opening argument the prosecutor talked about a murder for hire arrangement proposed by appellant and Carrasquillo. Appellant immediately objected to the statement and referred to his prior motion. The trial judge overruled the objection in part, ruling precisely as he had on the earlier motion. During Det. Davis's testimony, he testified in detail about the extraneous offenses. Appellant objected and the trial judge ruled in the same manner as just described. While Det. Davis was still on the stand, the State introduced its exhibit numbered 114. This exhibit was the first audio tape set out in the first point of error. It reflected in detail the same extraneous offenses which appellant objected to previously during trial and currently raises in points of error six and seven. Appellant objected to admission of the tape only on the grounds that portions of the tape were inaudible and that there was no identification, on the tape, of which person was speaking at any given moment. Appellant did not make an extraneous offense objection to this evidence.

---

**2.** Because appellant has failed to present any properly preserved issues in points of error eight through eleven, we will not address the merits of those points.

"[I]t is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered." *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Cr.App.1984) (see also cases cited therein). Because appellant failed to object to the admission of the taped conversation, which contained complete mention of the objected to offenses, on the grounds that it contained inadmissible extraneous offenses,[3] if admission of those offenses was error, the error was harmless. *Id.* Appellant's sixth and seventh points of error are overruled.

In his second point of error, appellant argues that the trial judge erred in excluding the testimony of Karen Snyder pertaining to prior acts of homosexuality by the deceased. Appellant argues that this testimony was relevant to appellant's testimony that he was sexually assaulted by the deceased, and that this incident precipitated a brawl in which the deceased was left unconscious in the back of his camper. The State replies that such evidence was inadmissible as hearsay, irrelevant, and improper evidence of specific acts to prove character.

During its case in chief, the State called Mrs. Basham to the stand. She testified about Basham's travel plans and movements immediately prior to leaving for Dallas. Mrs. Basham also testified about Basham's good character and specifically stated, in response to the State's question, that she and Mr. Basham had a "normal" sex life. Appellant did not object to this question.

According to appellant's testimony, he and Carrasquillo met the deceased in a Dallas bar. The deceased talked to Carrasquillo for some period of time, but appellant was not a part of this conversation. Appellant did not remember, but he assumed that when Carrasquillo and the deceased were ready to leave the bar, they had to carry appellant out because he was very intoxicated. The three men got into Basham's camper and began to drive. Appellant says that he did not know where they were going and that he was unconscious during this part of the evening. After an unknown amount of time, appellant awoke. Basham told Carrasquillo that he could no longer drive because he was too intoxicated. Carrasquillo agreed to drive, and Carrasquillo and Basham traded places. Appellant went back to sleep. Again, after an unknown period of time, appellant awoke. He awoke because he could feel someone fondling his genitals. When he opened his eyes, appellant saw that Basham had his hand in appellant's pants. Appellant hit Basham and refastened his pants. While zipping up, Basham attacked appellant.

According to appellant's testimony, Basham hit him in the face with an unknown object. The blow chipped one of appellant's teeth. Appellant fell forward, and he felt Basham stabbing him in the back. Carrasquillo apparently saw what was happening and pulled the camper to the shoulder of the road. Carrasquillo got out of his seat and began fighting with Basham. As soon as appellant got back to his feet, he also rejoined the fray. Appellant picked up some sort of bottle and hit Basham with it. Basham fell to the floor and stayed there. Appellant and Carrasquillo checked their wounds and the camper's location. They decided to take the camper to the first house or gas station that they encountered. Appellant took the wheel and resumed driving the camper. Suddenly, Carrasquillo was hit on the head by some object. He got out of his seat and resumed fighting with Basham. After a brief scuffle, Basham lay unconscious on the floor. Appellant placed a blanket over Basham, who was still breathing, and, with Carrasquillo, left the camper. The two men walked to a gas station less than a mile down the road.

**3.** Appellant's objection to the audio tape is very specific, but it makes no direct reference to extraneous offenses. While appellant's prior two objections to extraneous offenses were not specific, they incorporated the prior motion.

The effect of an objection which does not raise a certain legal ground for ruling is as if no objection, as it relates to that ground, had ever been made. See *Thomas v. State*, 723 S.W.2d 696, 705–06 (Tex.Cr.App.1986).

After testifying, appellant called Karen Snyder as a witness. This witness was examined outside the jury's presence in order to determine the admissibility of her testimony. While outside the jury's presence, Snyder testified that she had had an affair with Basham for approximately a year and a half and that the affair had ended in October of 1982. During their affair, Basham told Snyder that he had had a homosexual experience with a high school teammate and that he had had another "anonymous encounter" in a public restroom about seven to ten years prior to the time at which he related these stories to Snyder. Basham did not state whether these were the only two homosexual experiences that he had had. In addition, Snyder believed that Basham had continued to seek homosexual experiences. This opinion was based on a grocery bag that Basham brought to Snyder's apartment. The bag came from a grocery store in a "predominantly gay area of town." In order for Basham to have gone to this store, he would have had to go "along [sic] way out of his way to get to my apartment."

The State objected to this testimony, arguing that it was "irrelevant, immaterial, hearsay." Appellant responded that the evidence was a statement against interest, and therefore, an exception to the hearsay rule. In addition, appellant urged that the evidence was relevant to appellant's testimony concerning a sexual assault, was proper evidence, under Tex.R.Civ.Evid. 405, of specific acts to show character, conduct, appearance, or condition of mind, and was relevant to the relationship between the accused and the deceased. See V.T.C.A.Penal Code, § 19.06. The trial judge sustained the State's objection but allowed Snyder to testify that she and Basham had an affair.

■ First, we will address the State's hearsay objection. Former Art. 38.02 V.A.C.C.P., which controlled evidentiary matters at the time of appellant's trial, stated that the rules of civil evidence were to govern in criminal cases to the extent that they did not conflict with the Code of Criminal Procedure or the Penal Code. Civil

Rule of Evidence 803 creates a number of exceptions to the general rule that hearsay is objectionable. Subsection 24 states:

**Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true.

A confession of homosexual conduct, especially of an anonymous encounter in a public restroom, would tend to bring ridicule and disgrace upon a small-town minister. Neither at trial nor in its brief has the State made an argument as to why the statement-against-interest exception to the hearsay rule is inapplicable to this statement. Being equally unable to fathom a reason why this exception does not apply, we hold that the evidence was not excludable as hearsay.

■ Next, we will examine the State's contention that, even if character was relevant, this testimony constituted improper proof of character by proving specific acts. Tex.R.Civ.Evid. 405 provides:

**Methods of Proving Character**

(a) **Reputation or opinion.** In all cases in which evidence of character or trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) **Specific instances of conduct.** In cases in which character or trait of character of a person is an essential element of a claim or defense, proof may also be made of specific instances of his conduct.

Rule 405 draws a distinction between permissible uses of character and essential uses. Only in cases where the use of character is essential may character be proven with specific acts. In the instant case, appellant could, and did, make his claim without reference to the deceased's charac-

ter. We hold that, under Tex.R.Civ.Evid. 405, the trial judge ruled properly that Snyder's testimony was inadmissible.

The Rules of Civil Evidence, however, do not have unlimited application to criminal trials. Former Art. 38.02 V.A.C.C.P. applied the civil rules of evidence to criminal cases only to the extent that the civil rules are "not in conflict with the provisions of this Code [of Criminal Procedure] or of the Penal Code." Thus, we must examine the Code of Criminal Procedure and the Penal Code for a provision which would call for the admissibility of Snyder's testimony.

■ V.T.C.A.Penal Code, § 19.06 specifically allows all relevant testimony, in murder and voluntary manslaughter cases, concerning the killing and the defendant's state of mind at the time of the killing to be admitted. The text of § 19.06 provides:

> In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

This section, although not explicitly embracing capital murder prosecutions, does apply to capital murder. *Lamb v. State*, 680 S.W.2d 11, 17 (Tex.Cr.App.1984). To the extent that any civil rule of evidence would not allow evidence relevant under § 19.06, it is inapplicable to criminal cases.

■ Section 19.06 has been interpreted by this Court to have no effect on the scope of admissible evidence. *Werner v. State*, 711 S.W.2d 639, 644 (Tex.Cr.App.1986). Thus, § 19.06 does not vitiate the general rule that specific acts are inadmissible to prove character. See Tex.R.Civ.Evid. 405(b); *Hatley v. State*, 533 S.W.2d 27, 29 (Tex.Cr.App.1976); c.f. *Dempsey v. State*, 159 Tex.Cr.R. 602, 266 S.W.2d 875, 877–78 (1954) (specific prior acts of violence by deceased when self-defense is raised); C. Ray, 2 Texas Practice—Evidence 3d Ed. § 1506 (1980) (cases in which character is an element of the crime or a defense, e.g.,

indecency with a child V.T.C.A.Penal Code, § 21.11(b)). Section 19.06 does not, in the instant case, serve to expand the permissible forms of proof available. Because Basham's character is not an essential element of the offense of capital murder nor is it an essential element of a defense to capital murder, the trial judge properly excluded Snyder's testimony concerning specific acts to prove Basham's character.

Appellant never sought to introduce opinion or reputation evidence concerning Basham. Because of this, we need not address whether character evidence, per se, would have been relevant. Appellant's second point of error is overruled.

In his twelfth point of error appellant argues that photographs designated as State's exhibits 1, 3, 4, 8, and 10 were improperly admitted into evidence. Appellant argues that, because the deceased's body had been moved prior to the taking of these photographs, they had no probative value and should have been excluded because of their prejudicial effect. The State responds that the photographs were relevant to prove material issues and were properly admitted.

■ This Court set out the basic rules for admission of photographic evidence in *Martin v. State*, 475 S.W.2d 265 (Tex.Cr. App.1972). There we stated:

> [I]f a photograph is competent, material and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible.

*Id.* at 267 (footnotes omitted). More recently, we have expanded on our *Martin* holding and explained the manner in which this rule will be applied by this Court.

> If a verbal description of the item, be it a body, a weapon, or a location is admissible, a photograph depicting the same is also admissible. Only if the probative value of the photograph were very slight and the inflammatory aspects great

would it be an abuse of discretion to admit the photograph.

*Green v. State,* 682 S.W.2d 271, 292 (Tex. Cr.App.1984).

State's exhibits 1, 3, and 4 all show a frontal view of the body of the deceased. In each photograph, the towel used to strangle the deceased is visible. These photographs, despite the fact that the body has been moved from the position in which it was discovered, depict the manner in which the ligature was placed about the neck and then twisted in order to cause death. Officer Joe Bishop testified that these photographs accurately depicted what they purported to be. Because these photographs were probative of a material issue, the manner in which the deceased was killed, and testimony on this issue would have been admissible, admission of these photographs was not error under *Green,* supra, and *Martin,* supra.

■ State's exhibit 7 is a photograph showing what appears to be a bite mark around the deceased's nipple. Again, the fact that the body had been moved in no way affects the probative value of the photograph. Because the photograph shows the condition of the body and the location of a wound, it is relevant and competent evidence. *Harris v. State,* 661 S.W.2d 106, 107 (Tex.Cr.App.1983). Admission of exhibit 7 was not error.

■ State's exhibit 8 is a photo showing the body of the deceased from about six inches above the waist to the midpoint of his shins. The deceased's shirt is pulled up, exposing his abdomen. Because the photograph was taken after the body had been moved, it is not relevant to show the position of the body when it was discovered. In addition, we are unable to discern whether the photograph shows any wounds on the deceased's body. It is unclear what probative value this photograph has; however, it is by no means gruesome. The photograph is indistinguishable from one of a man lying on his side and sleeping. Even if admission of this photograph was error, its innocuous nature could not have inflamed the minds of the jurors given the other photographs admitted both with and

without objection. If error, we find that admission of exhibit 8 was, beyond a reasonable doubt, harmless to appellant.

■ State's exhibit 10 is a photograph of the back of appellant's head. Because the photograph shows the location and extent of injuries to the head, its probative value is unaffected by the fact the body had been moved prior to taking this picture. Admission of this photograph was not error. *Harris,* supra. Appellant's twelfth point of error is overruled.

In his third point of error appellant argues that the trial judge erred in failing to declare a mistrial based on the prosecutor's use of a transcription of evidence during closing argument which had not been admitted as evidence. Appellant contends that although the taped conversations were in evidence, the transcription was not. Because of this, the prosecutor's argument fell outside of the permissible types argument as set out in *Alejandro v. State,* 493 S.W.2d 230 (Tex.Cr.App.1973). The State responds that the prosecutor was merely using the transcription as his notes for summarizing the evidence.

During closing argument, the prosecutor made a number of factual assertions and defense counsel objected to these assertions at two points. All of the assertions to which appellant objects concerned the prosecutor's summary of the tapes made by Det. Davis. In his brief, appellant isolates seven comments that he alleges were improper. After the first group of three statements, appellant objected as follows:

Mr. CREIGHTON: [defense attorney]: [W]e're going to object to counsel reading from this transcript. The tapes were the best evidence of what was said. The tapes were very poor and inaudible and we object to this procedure at this point and we would ask the Court to advise the jury to disregard those sentences just read by the District Attorney to the jury.

THE COURT: All right. Mr. Ashby, you have a comment, sir?

MR. ASHBY: Yeah, Your Honor, I do. I believe, Your Honor, I can state what my opinion of what the defendant said.

Now, if the jury does not—or Mr. Carrasquillo either one, if the jury doesn't remember it was, they are the deciders of fact here just as in any other issue and I can use this to refresh my memory or to try to remember the best way I can quotes of what was said. I believe I can do that.

THE COURT: Okay, sir.

MR. CREIGHTON: He's reading from the transcript, Your Honor, and we object to that.

THE COURT: All right, sir. You may, as I ruled earlier, state your opinion of what the evidence has revealed, without indicating that any certain form of transcript is the transcript of the—of any tape that was played in this proceeding.

MR. CREIGHTON: Well, Your Honor, we object to him using it and reading it. That is not evidence.

THE COURT: I have sustained your objection in effect, I think, Senator [Creighton].

MR. CREIGHTON: Thank you.

MR. ASHBY: Your Honor, let me be sure that I understand the Court's ruling. Is there any—can I refer to the transcript where I have made my notes and what have you?

THE COURT: You may.

MR. ASHBY: As long as I don't quote from it?

THE COURT: Yes, sir. I'm sustaining his objection insofar as your conveying the impression to the jury that there is such a document as to which he referred and that that [sic] is the testimony or the evidence in the case.

MR. ASHBY: All right, Your Honor, thank you.

THE COURT: The evidence that's before the jury for the jury's consideration is from the tapes themselves.

MR. ASHBY: Thank you, Your Honor.

THE COURT: Mr. Creighton, does that comport with your objection, sir?

MR. CREIGHTON: If he just doesn't read from it.

THE COURT: All right, sir. That's my ruling. Go ahead.

In order to preserve error committed during jury argument, it is necessary to object until receiving an adverse ruling. *Graham v. State*, 566 S.W.2d 941, 954 (Tex.Cr.App. 1978). Because appellant received all of the relief that he requested at trial, there is no error to review. *Nethery v. State*, 692 S.W.2d 686, 701 (Tex.Cr.App.1985), cert. denied 474 U.S. 1110, 106 S.W.2d 897, 88 L.Ed.2d 931 (1986).

Later, during the same closing argument, the prosecutor made several more statements about what he believed the content of the taped conversations to be. Appellant's counsel objected to the argument as follows:

MR. TARLTON [defense counsel]: We object again, Your Honor, he's reading from the transcript. We request the Court to instruct the jury not to consider what he's just read.

THE COURT: All right. I will instruct the jury that any statement by the attorneys in this phase of the proceedings is their recollection of the testimony. Your own independent recollection will be used to recall the actual testimony that was presented in this trial, whether it be in accordance with statements of attorneys or whether it not be.

MR. CREIGHTON: We move for a mistrial.

THE COURT: All right. Your motion for mistrial is denied, sir.

Unlike the prior incident of alleged improper argument, appellant has preserved this instance by taking his objection to an adverse ruling.

In *Alejandro, supra,* this Court set out the proper scope of closing argument. In order to be proper, argument should fall within one or more of four permissible areas: "(1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement." *Id.* at 231 (citations omitted). In the instant case, the prosecutor was merely summarizing the audio tape which had been placed into evidence. Such jury argument clearly falls within the first permissible category of argument and is therefore a proper argu-

ment. To the extent that the jury was mislead into believing that the prosecutor's version of the taped conversations was somehow binding on the jury, we hold that the trial judge cured the misconception with a very specific instruction. Appellant's third point of error is overruled.

In his fourth point of error, appellant argues that the trial court erred in not excluding the testimony of Dr. Clay Griffith concerning the likelihood of appellant's future acts of violence because Dr. Griffith failed to provide appellant with the warnings required by *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The State responds that the warnings given by Dr. Griffith were adequate.

During the punishment phase, the State called Dr. Griffith as a witness. He testified to his qualifications as a forensic psychiatrist, that he had interviewed appellant, the substance of the interview, and that he diagnosed appellant as an ascending sociopath who constitutes a continuing threat to society. Dr. Griffith also related the warnings that he had given to appellant prior to the interview.

[Questions by Mr. Smith, prosecutor.]
Q: Dr. Griffith, tell the jury and the Court the warnings you gave to this defendant?
A: Well, first of all I introduced myself, told him what my profession was.
Q: Doctor, can you talk in that microphone a little bit?
A: I'm sorry. Told him what reason I was there, had the court order.
Q: Did you actually show him the court order?
A: Showed him the court order, he read it out loud so we knew he could read and that he did understand what the court order said. I told him the purpose of the interview, which the court order set out was to determine what his condition was for standing trial at that time and what his condition may have been at the time

of the alleged offense, that I would have to report my conclusions back to in this case the judge that issued the request. And that made it not confidential, that he should have thoroughly discussed this with his attorneys, and understand the consequences of this. That it was possible that it could be used against him in court, and further told him that the Supreme Court has said that he didn't have to talk to me and that he could stop the interview at any time he wanted to.

Appellant objected to Dr. Griffith's testimony on the grounds that it would violate the doctor-patient relationship, that the warning that Dr. Griffith gave concerning the fact that he must report to the person who had sought the examination was misleading, that Dr. Griffith had not been qualified as an expert witness, that the warning failed to inform appellant that the results of the interview might be used in the punishment phase to prove the second special issue, that appellant's fifth amendment rights were violated, and that Dr. Griffith's report and testimony were couched in legal terms which he is unqualified to apply. In his brief, appellant limits his challenge to Dr. Griffith's testimony to the grounds concerning the Fifth Amendment right against self-incrimination set out in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981),[4] and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In *Estelle v. Smith,* the defendant was on trial for capital murder. The trial judge ordered that the defendant be examined by a psychiatrist to determine whether the defendant was competent to stand trial. The attorney for the defendant was not asked permission to interview his client. At no time prior to the interview was defendant's counsel given notice of the interview. The examining psychiatrist discussed the interview and his conclusions with the prosecutor involved in the case, and the psychiatrist testified during the

---

4. We note that *Estelle v. Smith,* supra, was also decided on the basis of right to counsel as guaranteed by the Sixth Amendment. Appellant did not object on this ground and does not raise it in his brief. Additionally, because appellant's counsel made the motion to have appellant examined, there is no Sixth Amendment violation. *Buchanan v. Kentucky,* 483 U.S. 402, ——, 107 S.Ct. 2906, 2918, 97 L.Ed.2d 336 (1987).

punishment phase that the defendant would constitute a continuing danger to society. The Supreme Court held that Fifth and Sixth amendment rights apply to the punishment stage of a capital murder trial and to a defendant's interview with a court appointed psychiatrist on the issue of future dangerousness.[5] In its analysis of the Fifth Amendment dimensions of the case, the Supreme Court relied on its decision in *Miranda v. Arizona*, supra. The Court invoked Miranda's holding that "absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used against the individual in court.' [*Miranda*, supra 384 U.S. at] 467–469 [86 S.Ct. at 1624–25]." *Estelle v. Smith*, supra 451 U.S. at 467, 101 S.Ct. at 1875. Because of the Supreme Court's reliance on *Miranda* and the absence of Sixth Amendment overtones in the instant case, an examination of Dr. Griffith's warnings in terms of *Miranda* will be adequate to safeguard appellant's Fifth Amendment rights in this case.

▬ The rules concerning warnings set out by the Supreme Court in *Miranda* are that:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed.

Miranda, supra 384 U.S. at 444, 86 S.Ct. at 1612. Comparing the warnings required with those given by Dr. Griffith, there are two which were not given: the right to have counsel appointed and the right to have counsel present during the interview.

The *Miranda* requirements, however, are not absolute.[6] If some sort of procedural safeguard exists which will ensure that these rights are made known to a defendant, the warnings enumerated in *Miranda* are not necessary. *Id.* at 467, 86 S.Ct. at 1624. In the instant case appellant already had appointed counsel at the time that Dr. Griffith interviewed the appellant. In such a case, we believe that the procedure of appointing an attorney for a defendant is an adequate "procedural safeguard effective to secure the privilege against self-incrimination," as that privilege extends to the right to be informed of the right to have counsel appointed.

The second omission in Dr. Griffith's warnings, the failure to warn appellant that he has the right to have counsel present during the interview, is not error within the context of the instant case. Dr. Griffith was appointed to determine whether appellant was competent to stand trial. In such a setting, a defendant has no right to have counsel *present* during questioning. *Satterwhite v. State*, 726 S.W.2d 81, 92 (Tex.Cr.App.1986) (reversed on other grounds —— U.S. ——, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988)). See also *Estelle v. Smith*, supra 451 U.S. at 471 n. 14, 101 S.Ct. at 1877 n. 14 and cases cited therein. Because appellant had no right to have his attorney present, the failure of Dr. Griffith to include this warning was not error.

Finally, appellant argues that Dr. Griffith's warning that he would have to report

---

**5.** The Court limited its holding to the use of pretrial psychiatric examinations for punishment issues. *Estelle v. Smith*, supra 451 U.S. at 466, 101 S.Ct. at 1875. In cases in which a defendant raises the issue of sanity or competence, the State may compel the defendant to talk to a psychiatrist. *Id.* at 465, 101 S.Ct. at 1874.

**6.** We wish to note that this view that the dictates of *Miranda* are not an absolute prophylactic rule is not shared by all current members of the Supreme Court. This debate does not focus whether *Miranda* must be complied with, but rather the degree of compliance which is necessary to satisfy that the underlying Fifth and Sixth Amendment rights protected by *Miranda* are honored. E.g., *Moran v. Burbine*, 475 U.S. 412, 434–468, 106 S.Ct. 1135, 1148–1166, 89 L.Ed.2d 410, 429–451 (1986) (Stevens, J. dissenting); *New York v. Quarles*, 467 U.S. 649, 674–690, 104 S.Ct. 2626, 2641–2650, 81 L.Ed.2d 550, 569–579 (1984) (Marshall, J. dissenting). Despite the disagreement which exists on this point, we are constrained to go no further than the majority of the Supreme Court in defining the outside limits of protection offered by the *federal* constitution. See *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

his finding from the interview to "whomever called" him was misleading. During a voir dire examination by defense counsel, Dr. Griffith testified as follows:

Q: Did you tell Mr. Purtell that you would testify that he was—would be dangerous in the future if you found him to be so?

A: No. I didn't.

Q: Did you—you stated you also told him that it wasn't confidential since you must tell the results of the test to whomever called you, is that correct?

A: No, sir. I did not say that.

Q: I'm sorry what did you say?

A: I said I would have to report to whomever asked me to do the examination what my findings were in terms of the competency and what his condition was at the time of the alleged offense.

Q: Now, during this warning you gave him, you've stated under oath that Mr. Irsfeld called you, is the correct, the county attorney?

A: Yes, sir. I believe he was the original one to call me.

Q: Okay. Do you know who in fact filed the motion asking for the appointment?

A: No, sir. I was told that the District Attorney and that you also agreed to my being appointed.

Q: Wouldn't it be reasonable to think that if I had told Mr. Purtell that I was getting somebody appointed, that wouldn't it be reasonable to think that you were referring to you reporting your results to me instead of to the State?

A: Well, it is reasonable in that you certainly had access to the report that I sent to the Judge.

■ Appellant's argument has two parts. He argues that by stating that he would have to report to whomever had requested the examination could have misled the appellant into believing that the report would only go to his attorney. If the above quoted testimony were the only evidence concerning the warnings given, then appellant's argument might have merit. Dr. Griffith's other testimony, however, reveals that appellant was told that the meeting was not confidential and that the results of the interview could be used against him. These two statements were adequate to put appellant on notice that this was not a situation in which he was speaking to an agent of his attorney. *Miranda,* supra 384 U.S. at 469, 86 S.Ct. at 1625.

■ The second component of appellant's argument is that the warning failed to tell appellant that the interview could be used during the punishment phase of his trial. Appellant cites no authority in support of this proposition. *Miranda* does not require an interrogating officer, or anyone else, to inform a defendant of the possible manner in which a statement can be used against him. The central premise of the *Miranda* decision is that the best protection of a defendant's rights is likely to come from his attorney. *Id.* at 469–70, 86 S.Ct. at 1625–26. Absent some specific requirement that an interrogator explain all of the possible legal uses of a piece of evidence to a defendant, we hold that defense counsel is the party best qualified and best situated to carry out this function. Appellant's fourth point of error is overruled.

■ In his fifth point of error, the appellant contends that the trial court erred in failing to define the term "deliberately" in the court's instructions to the jury at the punishment phase. This Court has repeatedly held that, because the term "deliberately" has not been defined by statute, the term is to be understood in light of common usage and need not be defined in the charge to the jury on punishment. E.g., *Demouchette v. State,* 731 S.W.2d 75, 80 (Tex.Cr.App.1986), cert. denied, — U.S. —, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Point of error five is overruled.

The appellant has filed a pro se brief in this appeal. Although he is not entitled to hybrid representation, see *Stephen v. State,* 677 S.W.2d 42, 45 (Tex.Cr.App.1984), we have reviewed the brief, in the interest of justice, because the penalty of death was assessed in this case. See *Modden v. State,* 721 S.W.2d 859, 863 (Tex.Cr.App. 1986), cert. denied, — U.S. —, 108 S.Ct.

1603, 99 L.Ed.2d 917 (1988). We find the contentions therein to be without merit.

Having considered the appellant's points of error and finding no reversible error, we affirm the judgment of the trial court.

TEAGUE, J., dissents.