Steven Mark CHANEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–87–01371–CR.

Court of Appeals of Texas,
Dallas.

July 5, 1989.
Discretionary Review Refused
Nov. 22, 1989.

John H. Hagler, Dallas, for appellant.

---

Pamela Sullivan Berdanier, Dallas, for appellee.

Before HOWELL, LAGARDE and WHITTINGTON, JJ.

HOWELL, Justice.

A jury convicted Steven Mark Chaney of murder and assessed his punishment at life imprisonment and a $5,000 fine. In four points of error, appellant challenges the sufficiency of the evidence to support his conviction and claims that a hearsay statement of the victim, an oral statement of appellant, and testimony regarding extraneous offenses were erroneously admitted by the trial court, thereby creating reversible error. We disagree with these contentions and affirm.

## I. INSUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

■ Initially, we address appellant's insufficiency claim. In reviewing the sufficiency of the evidence, our inquiry is limited to determining whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Purtell v. State,* 761 S.W.2d 360, 365 (Tex.Crim.App. 1988). The same standard applies in both direct and circumstantial evidence cases. *Livingston v. State,* 739 S.W.2d 311, 329 (Tex.Crim.App.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). The jury is entitled to make credibility determinations regarding the testimony of witnesses. *Williams v. State,* 692 S.W.2d 671, 676 (Tex.Crim.App.1984); *Foster v. State,* 687 S.W.2d 65, 66 (Tex.App.— Dallas 1985, pet. ref'd).

A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except the guilt of the defendant; proof amounting to only a strong suspicion or mere probability is insufficient. *Guiton v. State,* 742 S.W.2d 5, 10 (Tex.Crim.App.1987). Yet every fact need not point directly and independently to the defendant's guilt. It is enough if the verdict of guilty is warranted by the combined and cumulative force of all incriminating circumstances. *Livingston v. State,* 739 S.W.2d at 330; *Beardsley v. State,* 738 S.W.2d 681, 685 (Tex.Crim.App.1987).

In the case at bar, the jury heard the testimony of more than twenty-five witnesses on various subjects: the two victims, the crime scene, the physical evidence, the appellant's relationship with the victims, and appellant's alibi defense. Appellant did not testify. Although two persons, John and Susan Sweek, were found murdered at the crime scene in this case, the State elected to proceed against appellant only for the murder of John Sweek.

### B. Chronology of Events

Near midnight on June 20, 1987, Dallas police were summoned to an east Dallas apartment on an "unconscious person" call. Rick Sweek, brother of the deceased John Sweek, said that he looked through the living room window and saw two bodies lying on the kitchen floor of the apartment. Police arrived and discovered a deceased male and female with their throats slashed. The bodies were covered with blood and bore numerous stab wounds. In addition, some human bite marks were found on the lower left arm of the male victim. Dr. James Weiner of the Medical Examiner's Office testified that the victims died from the neck wounds, which severed both victims' carotid arteries and jugular veins. He estimated the time of death to be between noon and midnight of June 20, 1987.

Jack Rasnic, a friend of the Sweeks, testified that he had spent Friday, June 19, 1987 with John Sweek, and they had gone fishing. Sweek had removed his shirt during the course of the day, and Rasnic said he had seen no injuries on Sweek's arms or upper body. The pair had agreed to go fishing again Saturday, but Rasnic was unable to contact Sweek by telephone—his line was busy the entire day. Rasnic went to Sweek's apartment twice on the evening of June 20. He knocked loudly on the door

but received no response. Sometime after 10 p.m., Rasnic concluded something was wrong; he called his girlfriend's brother, who called Rick Sweek, who in turn called the police. Fire department personnel and paramedics first arrived around 11:30 p.m.

Through the testimony of Curtis Hilton, appellant's coworker at a Las Colinas construction site in Irving, the State established that the deceased, John Sweek, had sold cocaine to appellant on a regular basis for more than one month. Hilton said that as often as four times a week, he and appellant would travel together after work to Sweek's apartment to purchase cocaine. Hilton testified that appellant often purchased the cocaine on a "front" basis, meaning that Sweek would give appellant cocaine on credit as long as appellant paid some money on his existing debt. Hilton said that because of this "running credit line," appellant was "constantly" in debt to Sweek.

The last time Hilton and appellant went to Sweek's apartment together was Saturday, June 13, 1987—one week before the murders. On that date, Hilton said appellant purchased one-quarter of an ounce of cocaine costing $475; appellant paid some money on his old debt but did not have cash to cover this new purchase. The next day, June 14, Hilton went alone to Sweek's apartment to purchase additional cocaine. Sweek told Hilton that appellant's debt was his largest outstanding debt and that he "drastically" needed appellant to pay it in full. Hilton said the amount of the debt was approximately $500.

Hilton testified that he did not speak again with appellant until the Wednesday following the murders. Appellant telephoned Hilton and asked if Hilton had heard that John and Sally Sweek had been killed. During this conversation, appellant told Hilton that he had cleared up his entire debt with Sweek. Hilton, knowing that Sweek recently had said appellant still owed him $500, became suspicious and decided to call the police.

The following day appellant appeared unannounced at Hilton's apartment complaining that he had been picked up and questioned about the murders. He repeatedly told Hilton that "he couldn't believe this was happening to him." He related to Hilton a number of grisly details about the murders, including statements that Susan Sweek had been restrained and forced to watch while John Sweek was tortured. Hilton said appellant told him he had gotten these details from the police.[1]

Appellant also told Hilton that Hilton was "his alibi." Further, appellant strongly urged Hilton to repay some money Hilton owed him for drugs because "he needed to get out of town" since it was "too hot here."

### C. Police Investigation

Investigator John Westphalen conducted the police inquiry into the Sweeks' deaths. He testified that, based on the telephone call from Hilton, he went on the Thursday following the murders to the Irving construction site to question appellant about the murders. Westphalen said that he approached appellant, identified himself, and displayed his badge. Immediately, appellant said, "Is this about the murders?" Westphalen responded affirmatively, and appellant stated that "he had eight witnesses who knew where he was on the night of the 20th and he had not been in that apartment in three weeks." At this time, Westphalen arrested appellant for two outstanding alias tickets and took him in for questioning.

Appellant was interviewed and released. Investigator Westphalen testified that he did not show appellant any photographs of the crime scene during this initial questioning. Westphalen arrested appellant again on July 20, 1987 and charged him with capital murder. At this second arrest, Westphalen confiscated appellant's tennis shoes for comparison to the bloody footprints. Also subsequent to this arrest, Westphalen ordered full dental impressions

---

1. The medical examiner, Dr. Weiner, stated that several of John Sweek's incisive wounds, as well as the bite marks, were defensive in nature, indicating a possible torture-type situation. The wounds to Susan Sweek penetrated much deeper.

and wax bite impressions of appellant's mouth; appellant voluntarily signed a consent form to have the impressions taken.

### D. Physical Evidence

Investigator James Vineyard of the Physical Evidence Section of the Dallas Police Department testified that he was called to photograph the crime scene and preserve the physical evidence. He took more than thirty photographs in the apartment, dusted for fingerprints, and confiscated a number of items of physical evidence, including drug paraphernalia and a notebook containing apparent drug transaction notations. The telephone receiver was found off its hook.

Vineyard testified that he found dried bloody footprints in the kitchen and on the carpet in the living and dining rooms. He said that he thought two different types of shoes had made the footprints—some by athletic, soft-soled shoes and some by heeled, hard-soled shoes. Vineyard also found more than fifty individual fingerprints in the apartment. A large number of the fingerprints belonged to the victims. One fingerprint lifted from the lower part of a kitchen wall was matched with appellant's left thumb.[2] The height and location of appellant's thumbprint was consistent with someone squatting or kneeling near the entrance to the kitchen. Vineyard said that in his opinion, appellant's thumbprint had been recently left.

Regarding the bite marks, the medical examiner, Dr. Weiner, testified that in his opinion, the marks on Sweek's lower left arm were inflicted "at or about the time of Mr. Sweek's death." Dr. Jim Hales, chief dental consultant for the Dallas County Medical Examiner's Office and board-certified forensic odontologist, testified as an expert about the bite marks. Hales used more than fifteen photographs of the bite marks, along with the plaster and wax dental impressions of appellant, to explain to the jury how bite mark comparisons are made. He said that he fully examined the bite marks themselves the day after Sweek died, and spent twenty hours comparing the photographs to the plaster models of appellant's mouth.

Hales testified that the marks were inflicted by a human rather than an animal. He said that both the upper and lower arches of appellant's mouth were consistent with and "matched" the bite marks left on Sweek's arm. He said the spacing between appellant's teeth and the spacing in the bite marks were "very much" consistent. Hales concluded that, in his opinion and with reasonable dental certainty, appellant made the bite marks on Sweek's body.

The State also called Dr. Homer Campbell, a private consultant in the fields of forensic dentistry and forensic odontology, to testify as an expert about the bite marks. Campbell concluded that to a reasonable degree of dental certainty, appellant made the bite marks on Sweek's body.

The defense called Dr. John McDowell, a board-certified forensic odontologist, to testify about the bite marks. McDowell said that in his opinion, appellant could have made the bite marks; however, he could not state with any degree of certainty that appellant did make the marks. On cross-examination, McDowell said that appellant could not be wholly excluded from making the marks and that everything in the bite mark photographs was consistent with the models of appellant's teeth.

In regard to the bloody footprints, Lieutenant James Cron of the Dallas Sheriff's Department testified about his comparison of appellant's tennis shoes to the footprints found in the apartment. He stated that appellant's shoes bore a "pattern that is similar to the patterns" made on the kitchen floor. Cron said that appellant's shoes could have made the prints, but he could not conclusively say that they were the *only* shoes that could have made the marks.

---

2. Smears of blood on another kitchen wall, which appeared to be handprints, could not be matched. According to Vineyard, blood causes the fingers to slip across a surface, destroying the ridges normally used to identify individual fingerprints. Thus, even if fingerprints had been left, they would not have been sufficiently demarcated to compare to existing prints.

Charles Currier, an athletic footwear salesman for the Footlocker, testified for the defense about the pattern on the bottom of appellant's tennis shoes. He stated that the herringbone pattern on the bottom of appellant's shoes appeared on fifty to eighty percent of athletic shoes sold.

Further testimony about the shoes was elicited from Carolyn Van Winkle, a forensic serologist at the Institute of Forensic Science in Dallas. Van Winkle tested appellant's tennis shoes for traces of blood. She found no visible traces of blood; however, when a chemical solution was applied to the shoes, it reflected traces of blood in the right toe area and the upper left inner sole area. The traces were not significant enough for Van Winkle to determine the blood type, or even whether the blood was human or animal. She further testified that the tennis shoes appeared to have been polished with white shoe polish.

### E. Appellant's Alibi Defense

Appellant called several witnesses to testify as to his whereabouts during the day and night of Saturday, June 20, 1987. Larry Gavlick, project supervisor at the Irving construction site, testified that appellant reported for work at 7 a.m. Saturday. He said the construction crew was working Saturday to make up for some days that had been previously rained out. As was common during the summer months, Gavlick said that they also got "rained out" that Saturday and the entire crew was sent home after two hours. Gavlick drove appellant to his car at approximately 9 a.m. He said he did not see appellant get into his car or drive away.

John Hooper, Sr. testified that appellant and his daughter Lenora Murley had been dating. Appellant was living with Hooper and his family at their home in Millsap, Texas. Hooper said that appellant left for work Saturday at 5:15 a.m. and returned at 9:30 a.m. He said that he and his daughter were on the porch and greeted appellant upon his return. Appellant stayed at the house repairing an automobile until he received a phone call at 2:30 p.m.—Lenora's sister Janey was moving and needed appellant to come to Mabank, Texas to pick up some furniture she had been storing for him. Hooper said appellant borrowed the family pickup truck and left for Mabank at 5 p.m. On cross-examination, Hooper admitted that it would take one and one-half hours to drive from Irving to his home in Millsap and that appellant would have had to have left work by 8 a.m. to have returned to Millsap by 9:30 a.m.

Hooper's wife Dora testified that appellant returned from work around 9:30 or 10 a.m. She said he received the phone call from Janey at noon and left for Mabank at 2:30 or 3 p.m. On cross-examination, the State impeached her with her prior statements in which she said that appellant returned at exactly 9:30 a.m. and left for Mabank at noon.

Lenora testified that she was asleep when appellant returned home that Saturday morning. She said appellant woke her up at 9:30 a.m. Lenora stated that the phone call from her sister came around 2 or 3 p.m. and that appellant, she, and her son left her father's home around 5 p.m. En route, the truck she was driving had a flat tire about 6 p.m. near Lancaster. She called another of her sisters and persuaded her sister's friends to come and help them fix the tire. They repaired the tire by about 8 p.m. and arrived at her sister Janey's home between 10 and 10:30 p.m. Lenora testified that they spent the night there. On cross-examination, the State impeached Lenora's testimony with her prior statements that appellant had not returned from work until 10:30 or 11 a.m. that morning, and that her sister Janey did not call until 4:30 p.m.

Lenora's son, Barry Hines, testified that appellant returned from work around 9 a.m. He said the telephone call from the sister came between 2 and 3 p.m. Hines also stated that appellant remained at the home in Millsap until they left for Mabank in late afternoon.

Lenora's sister Janey testified that she telephoned appellant around 3 or 4 p.m. and that appellant arrived in Mabank around 10:30 p.m. She said appellant, Lenora, and Barry spent the night at her

home. On cross-examination, the State impeached her testimony with her prior statement that she had called appellant at 4:30 p.m.

### F. Conclusion

Appellant was charged with intentionally and knowingly causing the death of John Sweek by stabbing him with a knife, a deadly weapon. Based on our review of the physical evidence and testimony, we conclude that the evidence was sufficient to support appellant's guilt as found by the jury. Appellant regularly purchased drugs from the victim, and his growing debt gave appellant a motive for the killing. His fingerprint was found in the kitchen area, and bloody footprints consistent with appellant's shoes were also found in the apartment.[3] Traces of blood were found on the shoes despite the fact that they had been polished with shoe polish. Medical testimony strongly indicated that appellant inflicted the bite marks on the victim's forearm. In addition, appellant mysteriously knew graphic details of the murder scene and the manner of death, and appellant contemplated leaving town because the atmosphere after the murders was "too hot." Appellant's unsolicited oral statements to police purporting to create an alibi support his guilt, as do his requests that his friend Hilton be his "alibi" and his "witness" that appellant had not been to Sweek's apartment for a week before the murders. Further, appellant's alibi witnesses gave conflicting accounts of appellant's whereabouts on the day of the murders. Leaving credibility determinations to the jury, we hold that a rational trier of fact could have found the elements of murder beyond a reasonable doubt. The combined and cumulative force of all the incriminating circumstances excludes all reasonable hypotheses except appellant's guilt. We overrule point one.

### II. HEARSAY STATEMENT OF VICTIM

■ By his second point, appellant complains that a hearsay statement of the vic-

tim was erroneously admitted by the trial court and caused reversible error. At trial, the State offered the following testimony of Curtis Hilton:

[STATE:] At that time on Sunday, June the 14th, did Mr. Sweek mention an existing debt between him and Steve Chaney?

[WITNESS:] Yes, sir.

[STATE:] And what did that consist of?

[DEFENSE:] I'm going to object. Hearsay.

THE COURT: Overruled. You may answer the question.

[DEFENSE:] Judge, this is not in the presence of the defendant when this statement was made.

THE COURT: I understand.

[DEFENSE:] Okay. .

THE COURT: You may answer the question.

[STATE:] You may answer.

[WITNESS:] He mentioned the debt that Steve Chaney owed him as being his most outstanding debt and that he needed the money drastically.

[STATE:] Did he mention a dollar figure?

[WITNESS:] $500. I had seen it written on a piece of paper. His—I guess his owe-me list was what it was.

We note, however, that essentially the same evidence was admitted without objection on several other occasions. Hilton testified that appellant regularly purchased cocaine on a "front" or credit basis, that he had a "running credit line" with Sweek, that he was "constantly" in debt to Sweek, and that the June 13 purchase for $475 was made on a credit rather than a cash basis. If an objected-to hearsay statement is sufficiently proven by other competent and unobjected-to evidence, the admission of the hearsay is properly deemed harmless and does not constitute reversible error. *See Livingston v. State*, 739 S.W.2d at 333; *Anderson v. State*, 717 S.W.2d 622, 627 (Tex.Crim.App.1986). Therefore, the trial

---

**3.** A shoe print comparison less than positive may still be sufficient to prove identity when combined with other evidence. *Livingston v. State*, 739 S.W.2d at 330.

court did not err in admitting the victim's statement. We overrule point two.

### III. ORAL STATEMENT OF APPELLANT

 In his next point of error, appellant alleges that his oral statements to Investigator Westphalen at the Irving construction site were the product of custodial interrogation and thus inadmissible under article 38.22 of the Texas Code of Criminal Procedure. We disagree. "Custodial interrogation" entitling a defendant to the *Miranda*[4] warnings is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Cannon v. State,* 691 S.W.2d 664, 671 (Tex.Crim.App.1985), and cases cited therein. However, an oral admission against interest, which does not stem from custodial interrogation and is given freely, voluntarily, and without compulsion or persuasion, is admissible against a defendant. *Shiflet v. State,* 732 S.W.2d 622, 623 (Tex.Crim.App.1985); TEX.CODE CRIM.PROC.ANN. art. 38.22, § 5 (Vernon 1979). A defendant's oral statement made in the investigatory phase of a case, before it reaches the accusatory phase and during a time when a defendant is not in custody, is admissible. *Shiflet v. State,* 732 S.W.2d at 628.

In the present case, Investigator Westphalen simply was following up on a tip when he went to question appellant at the jobsite. The officer merely identified himself and showed his badge; he did not ask appellant any questions, place him under arrest, or restrict his freedom in any way before appellant spoke. Appellant was not in custody. Therefore, his unsolicited oral statements relating to the murders and his alibi were not the product of custodial interrogation but were voluntary. As such, they were admissible. TEX.CODE CRIM. PROC.ANN. art. 38.22, § 5 (Vernon 1979). *See also Graves v. State,* 712 S.W.2d 627, 630 (Tex.App.—Beaumont 1986, no pet.); *Phillips v. State,* 639 S.W.2d 501, 504 (Tex. App.—Fort Worth 1982), *pet. ref'd,* 651 S.W.2d 745 (Tex.Crim.App.1983). Finding no error, we overrule point three.

### IV. EXTRANEOUS OFFENSES BY APPELLANT

 In his final point, appellant maintains that testimony relating to certain extraneous drug offenses was erroneously admitted and constituted reversible error. It is axiomatic that a defendant cannot be tried for a collateral crime or for being a criminal generally. *See Williams v. State,* 662 S.W.2d 344, 346 (Tex.Crim.App.1983), and cases cited therein. In general, an extraneous offense is not admissible unless the transaction is relevant to a material issue in the case, and the relevancy of the evidence outweighs its inflammatory or prejudicial effect. *Turner v. State,* 754 S.W.2d 668, 672 (Tex.Crim.App.1988). In certain situations, however, evidence of extraneous offenses is admissible. *See id.* at 672 n. 1. Specifically, in murder prosecutions, evidence relating to the previous relationship between the defendant and the deceased is admissible, as is evidence relating to the condition of a defendant's mind. TEX. PENAL CODE ANN. § 19.06 (Vernon 1989).

In the instant case, the court allowed testimony from Hilton and appellant's girlfriend Lenora relating to the appellant's purchases of cocaine from John Sweek and appellant's ingestion of cocaine on certain occasions. The evidence was offered by the State to prove that appellant had an ongoing, pre-existing relationship with the victim and to prove appellant's state of mind at the time of the murders. Appellant's motive, intent, and relationship with Sweek were contested issues at trial, and the probative value of the extraneous drug offenses in proving these elements outweighed any prejudicial effect they may have had. The evidence was properly allowed under section 19.06 of the Texas Penal Code; the court, therefore, did not err. We overrule appellant's fourth point.

We AFFIRM the trial court's judgment.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).