OPINION


Nos. 04-04-00071-CR and 04-04-00072-CR

The STATE of Texas,
Appellant

v.

Victor FRANCO,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2003-CR-4272 & 2003-CR-4273
 Honorable Pat Priest, Judge Presiding



 
Opinion by:    Sarah B. Duncan, Justice
 
Sitting:            Alma L. López, Chief Justice
Catherine Stone, Justice
Sarah B. Duncan, Justice
 
Delivered and Filed:   September 14, 2005

AFFIRMED
            The State of Texas appeals the trial court’s orders suppressing Victor Franco’s blood alcohol
test results and related testimony. We affirm.
 

Factual and Procedural Background
            On Friday, January 3, 2003, at approximately 7:58 p.m., Officer Pete Knutson of the San
Antonio Police Department arrived at the scene of an accident.


 The accident occurred at
approximately 7:50 p.m., when Franco ran a stop sign, causing his pickup to collide with another
vehicle. Both the driver of the other vehicle, Jovita Reyes, and her passenger and son, Joseph, were
killed. When Knutson confronted Franco, he smelled an odor of an alcoholic beverage and asked
Franco if he had been drinking. Franco responded that he left work, consumed one Bud Light beer,
and was on his way to his girlfriend’s house. Franco explained that he did not see the stop sign. After
Franco’s performance on standardized field sobriety tests


 showed signs that he was impaired, and
a portable breath test, conducted about an hour after the accident, indicated his blood alcohol level
was .09, he was arrested for driving while intoxicated and read his rights. Franco refused a request
for a blood sample and was then taken to a hospital for treatment of his injuries and a mandatory
blood withdrawal. The first blood sample, withdrawn at 10:05 p.m., yielded a blood alcohol level
of .07. A second blood sample, withdrawn at 11:55 p.m., yielded a blood alcohol level of .02.
Franco’s medical records at the hospital establish that he sustained only minor injuries in the
accident. At the time of the accident, Franco was twenty years old, 5'6" tall, with a weight of 130
pounds and no known drug allergies; at the hospital, he appeared “alert and oriented,” with “warm
and dry” skin. 
            Alleging both the per se intoxication and impairment theories of intoxication, the State
charged Franco with the manslaughter and intoxication manslaughter of Jovita and Joseph Reyes.
Before trial in each case, Franco moved to suppress the blood test results and related testimony. At
the ensuing suppression hearing, the State called the chief toxicologist for the Bexar County Medical
Examiner’s Office, Dr. Gary Kunsman. 
            Kunsman holds a bachelor of science degree from Virginia Tech in chemistry and a doctorate
from Louisiana State University Medical Center in pharmacology and forensic toxicology. While
obtaining his doctorate, and thereafter as a postdoctoral fellow at LSU, Kunsman researched how
alcohol alone or in combination with a commonly-used sleeping pill affect human performance and
specifically driving. Kunsman’s postdoctoral work also involved developing a device to measure
“upper body sway”– which he explained as “the lower part of your body basically staying in one
place but the upper part of your body is sort of moving around”– and correlating upper body sway
to the amount of alcohol a subject consumed. He found that “most people swayed more as their
blood-alcohol level would rise.” Kunsman also performed a study in which he determined there is
a very close correlation between the results of blood alcohol tests and portable breath tests.
            After concluding his fellowship, Kunsman went to work for the State of Oklahoma at its
Chief Medical Examiner’s Office as the assistant to the chief forensic toxicologist. He then went to
the Armed Forces Institute of Pathology, where he worked approximately five years in the forensic
toxicology division as part of the Office of the Armed Forces Medical Examiner, a laboratory of
which he ultimately became the co-director. Among the responsibilities of that office is to act as the
scientific advisor of the breath testing programs of the United States Park Police and the United
States Capitol Police and to act as a consultant to the Washington, D.C. Metropolitan Police.
            Kunsman left his position in D.C. to become the Bexar County Medical Examiner’s chief
toxicologist. In this role, Kunsman is responsible for the day-to-day operations of, and supervision
of all of the analytical procedures performed by, a full service forensic toxicology laboratory serving
law enforcement in Bexar, Kerr, Kendall, and occasionally Webb Counties. When testing for blood
alcohol concentration, Kunsman’s office performs two tests. The first procedure is a gas
chromatographic technique, which is considered the “gold standard.” The second is a “confirmation
test,” which uses an enzymatic method in which a blood sample is subjected to an ultraviolet light
to measure the blood alcohol concentration. During his career, Kunsman has authored around
twenty-five peer-reviewed articles, as well as three book chapters; but none of these deal with
retrograde extrapolation. He has also been an instructor for police officers in drug recognizance
expert training and is currently a clinical instructor in the master’s toxicology program at the
University of Texas Health Science Center. 
            The greatest percentage of cases in which Kunsman has been called to testify have involved
alcohol and retrograde extrapolations. Kunsman thus explained in great detail the process by which
alcohol is absorbed by and later eliminated from the human body, the generally accepted elimination
rate for social drinkers (between .015 and .02 grams per deciliter per hour), and specifically how
retrograde extrapolation could determine from a single measurement of blood alcohol what the blood
alcohol level was at an earlier time with scientific reliability if certain assumptions were made and
variables known. The most important variables are whether the person is in generally good health,
was in a social drinking situation before being stopped, drinks no more alcohol between the time of
the stop and the time the blood sample is taken, and is in the post-absorptive phase by the time of
the stop or accident. Kunsman testified that multiple tests with decreasing alcohol concentrations
provide a stronger foundation to conclude that a subject is in the post-absorptive phase and to
perform a retrograde extrapolation.
            Kunsman was asked whether he could estimate the blood alcohol concentration of a person
at the time of an accident that occurred at approximately 7:50 p.m. if he assumed the person was a
twenty-year-old male weighing 130 pounds and in good health, so that all his bodily functions were
performing well; who was drinking before the accident in a social situation, consumed no alcohol
after the accident and before his blood samples were withdrawn; showed some clues of impairment,
including upper body sway, during standardized field sobriety testing shortly after the accident; and
results of a portable breath test approximately one hour after the accident and results from blood
samples drawn approximately two and four hours after an accident were .09, .07, and .02,
respectively. Kunsman testified that he could, using a conservative approach, and assuming the
person was in the post-absorptive phase when the accident occurred, determine that the hypothetical
person’s blood alcohol concentration at 7:50 p.m., when the accident occurred, was at least above
.08 and “probably somewhere around a little over a .1,” even “possibly a .15 or a little higher.” 
            On cross-examination, Kunsman admitted that his calculations involved assumptions derived
from population statistics. However, when asked if he needed to know factors such as when Franco
last consumed alcohol, how rapidly he was drinking, what kind of alcohol he was drinking, his
mental state, how much and what kind of food he had eaten, Kunsman testified this information
“would be helpful” but “are actually factors that are important in absorption of alcohol” and
determining when absorption began “has no bearing on the question of elimination.” Kunsman
admitted, however, that “[d]etermining the absorption phase is one of the critical elements in ...
being able to apply the retrograde methodology and extrapolation to be able to come up with a
B.A.C. at a time past.” As Kunsman explained, these factors would not affect his assumption that
the person was in the post-absorptive phase at the time of the accident except in two situations: if
the person had consumed alcohol after the accident and if “the person had consumed ... a fairly
substantial number of drinks immediately before getting into the car and having this incident ....”
Kunsman also admitted that he had no information regarding Franco’s food or alcohol intake before
the accident or whether in fact his bodily functions were in fact working well – all of which would
affect when Franco achieved his peak blood alcohol level. Kunsman admitted that if a hypothetical
individual consumed a meal and alcohol with that meal, the presence of food in his stomach would
affect the absorptive phase to the point that peak blood-alcohol level could be reached some time
much later than when the incident occurred. It is for this reason that one of the assumptions
necessary to a retrograde extrapolation is that the individual be in the post-absorptive phase at the
time of the stop or accident. Kunsman had not been provided with any facts that would justify
assuming that Franco was in the post-absorptive phase at the time of the accident. Finally, the
following exchange occurred between Franco’s trial counsel, Jaime Cavazos, and Kunsman:
            Q:        So [the authors of an article in the British Journal of Clinical
Pharmacology] are in agreement with you that in order to be able to
accurately point to a B.A.C. level of a particular individual you would
have to have more information than you have in the Franco case,
would you agree with me, sir?
 
A:Yes, you need specific information about that individual.

On redirect, Kunsman testified that the fact that three tests were performed, “although it doesn’t –
it doesn’t necessarily prove that we are in that post-absorptive phase,” “it adds weight and support
to that conclusion and makes it a more reasonable conclusion.” On re-cross examination, however,
Kunsman admitted he could not testify to the reliability of the particular portable breath test machine
that was used to test Franco’s alcohol level the night of the accident. During the attorneys’
arguments, the trial judge stated that he would not consider the result of the portable breath test
because he did not know the type of instrument that was used or its reliability; he would consider
only the blood tests. Later, however, the judge stated as follows:
If you used the breath test, the hand-held breath test and assume its reliability
at .09 an hour after the accident, there is still zero evidence to support the assumption
that he was in the post-absorption phase. Because 90 to 95 percent of the people
involved in an accident are in the post-absorption phase does not warrant the
conclusion that this individual on this occasion was.
 
B, he clearly does not fit the pattern of the average person. If you use the
earlier reading he was dissipating or eliminating alcohol at .02 for the first two hours
or first hour and at .025 for the next two hours, which takes him completely out of
the realm of the average human being.
 
The expert said it better than I can. He doesn’t have enough information to
talk about this individual. He can talk about people, generally, and that ain’t good
enough. 

The judge then granted the motion to suppress the blood test results and related testimony, finding
that Kunsman’s retrograde extrapolation testimony is unreliable and that the probative value of the
evidence is outweighed by its prejudicial effect. The State has appealed.
Retrograde Extrapolation
Standard of Review
            We review the trial court’s ruling on a motion to suppress scientific evidence for an abuse
of discretion. See Mata v. State, 46 S.W.3d 902, 908 (Tex. Crim. App. 2001).
Discussion
            The Texas Court of Criminal Appeals has instructed us to review the admissibility of
retrograde extrapolation testimony using the following analytical framework:
We believe that the science of retrograde extrapolation can be reliable in a given
case. The expert’s ability to apply the science and explain it with clarity to the court
is a paramount consideration. In addition, the expert must demonstrate some
understanding of the difficulties associated with a retrograde extrapolation. He must
demonstrate an awareness of the subtleties of the science and the risks inherent in any
extrapolation. Finally, he must be able to clearly and consistently apply the science.
 
 The court evaluating the reliability of a retrograde extrapolation should also consider
(a) the length of time between the offense and the test(s) administered; (b) the
number of tests given and the length of time between each test; and (c) whether, and
if so, to what extent, any individual characteristics of the defendant were known to
the expert in providing his extrapolation. These characteristics and behaviors might
include, but are not limited to, the person’s weight and gender, the person’s typical
drinking pattern and tolerance for alcohol, how much the person had to drink on the
day or night in question, what the person drank, the duration of the drinking spree,
the time of the last drink, and how much and what the person had to eat either before,
during, or after the drinking.
 
Obviously, not every single personal fact about the defendant must be known to the
expert in order to produce an extrapolation with the appropriate level of reliability. 
As the Kentucky Supreme Court has recognized, if this were the case, no valid
extrapolation could ever occur without the defendant’s cooperation, since a number
of facts known only to the defendant are essential to the process. If the State had
more than one test, each test a reasonable length of time apart, and the first test were
conducted within a reasonable time from the time of the offense, then an expert could
potentially create a reliable estimate of the defendant’s BAC with limited knowledge
of personal characteristics and behaviors. In contrast, a single test conducted some
time after the offense could result in a reliable extrapolation only if the expert had
knowledge of many personal characteristics and behaviors of the defendant. 
Somewhere in the middle might fall a case in which there was a single test a
reasonable length of time from the driving, and two or three personal characteristics
of the defendant were known to the expert. We cannot and should not determine
today the exact blueprint for reliability in every case. Suffice it to say that the factors
must be balanced.

Mata v. State, 46 S.W.3d 902, 916-17 (Tex. Crim. App. 2001).


 
            Kunsman demonstrated that he possessed the “ability to apply the science” of retrograde
extrapolation; he “explain[ed] it with clarity,” “demonstrat[ing] some understanding of the
difficulties associated with a retrograde extrapolation” and “an awareness of the subtleties of the
science and the risks inherent in any extrapolation”; and “he ... clearly and consistently appl[ied] the
science.” Id. Indeed, it is Kunsman’s demonstrated knowledge and understanding of the science
underlying retrograde extrapolations that convince us the trial court did not abuse its discretion in
excluding his testimony. As Kunsman admitted, to accurately testify regarding Franco’s blood
alcohol concentration at the time of the accident, he would need more “specific information about”
Franco. We therefore hold the trial court did not abuse its discretion in suppressing Kunsman’s
retrograde extrapolation testimony as unreliable. 
Blood Test Results
            In its second point of error, the State argues the trial court erred in suppressing the results of
the blood tests pursuant to Rule 403 of the Texas Rules of Evidence.
Standard of Review
            We review the trial court’s evidentiary ruling under Rule 403 for abuse of discretion. Melcher
v. State, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). We “should not reverse a trial judge whose
ruling was within the zone of reasonable disagreement.” Id. at 440.
Discussion
            Review of the trial court’s Rule 403 determination requires us to balance four nonexclusive
factors: “(1) the probative value of the evidence; (2) the potential to impress the jury in some
irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent’s
need for the evidence.” Id. The first factor requires us to look at “how compellingly the evidence
serves to make a fact of consequence more or less probable.” Id. This is arguably “[t]he single most
important factor.” Id. at 449 (Cochran, J., concurring, joined by Meyers, Price, and Johnson, J.J.).
Franco’s blood test results are evidence that he had consumed alcohol, and the Texas Court of
Criminal Appeals has held that test results showing consumption of alcohol “tend to make it more
probable that [the defendant] was intoxicated at the time of driving under both the per se and
impairment definitions of intoxication.” Melchor, 152 S.W.3d at 440. However, “the relative
probative value of the [results] depends primarily upon ... the degree to which the test result exceeds
the legal limit ... and ... the amount of time elapsed between driving and the taking of the test.” Id.
at 449 (Cochran, J., concurring, joined by Meyers, Price, and Johnson, J.J.). The probative value of
the results of Franco’s blood tests is significantly diminished by the two and four hour delay in
obtaining the samples and by the fact that both results are below the legal limit. “When a test is
obtained long after the arrest and the result is at or below the legal limit, the logical inference that
the person had a 0.08% BAC at the time of driving may be so tenuous that a trial judge appropriately
exercises his discretion by excluding that specific test result under Rule 403 absent expert testimony
that extrapolates the test result back to the time of driving.” Id. This factor thus weighs heavily in
Franco’s favor.
            The second factor asks whether the evidence has the potential to impress the jury in an
irrational way. The focus is on whether the evidence is “unfairly prejudicial”; that is, whether it has
a “tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged.”
Melcher, 152 S.W.3d at 440. Although we can fathom no reason for the State to introduce test results
showing blood alcohol concentration below the legal limit other than to invite the jury “to conduct
its own crude retrograde extrapolation,” the Texas Court of Criminal Appeals has rejected this
argument. See Stewart v. State, 129 S.W.3d 93, 97 (Tex. Crim. App. 2004). The results showing
Franco consumed alcohol “relate[] directly to the charged offense,” Melcher, 153 S.W.3d at 440-41,
and will not necessarily encourage a jury to engage in its own retrograde extrapolation because the
jury will not need to establish Franco’s exact blood alcohol concentration at the time he drove. See
Stewart, 129 S.W.3d at 97. The evidence is thus not unfairly prejudicial; and this factor weighs in
favor of admissibility.
            The third factor “looks to the time the proponent will need to develop the evidence, during
which the jury will be distracted from consideration of the indicted offense.” Melcher, 153 S.W.3d
at 441. Because the time needed to introduce the blood test results is relatively short and because the
results “relate directly to the charged offense,” this factor too weights in favor of admissibility. Id.
            The fourth and final factor in the Rule 403 analysis looks at the proponent’s need for the
evidence and “encompasses the issues of whether the proponent has other evidence establishing this
fact.” Id. The stipulated evidence at the hearing reflects that the State has other probative evidence
to establish Franco’s intoxication: Officer Knudson’s testimony that he smelled a strong odor of
alcohol on Franco’s breath, Franco was swaying, and Franco told him he drank a beer; the results
of the field sobriety tests, on which Franco showed signs of impairment; a videotape of Franco at the
scene, on which he states he had been drinking beer before the accident; and possibly the results of
the portable breath test taken at the scene an hour after the accident. In light of this other evidence
probative of intoxication, the State does not have a great need for the blood test results. This factor
thus weighs in favor of exclusion. See id.
            Because the sum of the Rule 403 factors slightly favors exclusion of the blood test results,
we hold the trial court’s decision to exclude the evidence was within the zone of reasonable
disagreement. We therefore hold the trial court did not abuse its discretion in granting Franco’s
motion to suppress and affirm its orders.
 
Sarah B. Duncan, Justice
 
Publish