

Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★   ★   ★                    ★   ★   ★

# OPINION

Nos. 04-07-00788-CR, 04-07-00789-CR, 04-07-00790-CR and 04-07-00791-CR

Leslie A. **SUBIRIAS**,
Appellant

v.

**THE STATE OF TEXAS**,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2006-CR-11023, 2006-CR-11024, 2006-CR-11025, 2006-CR-11026
Honorable Philip A. Kazen, Jr., Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:       Alma L. López, Chief Justice
               Catherine Stone, Justice
               Sandee Bryan Marion, Justice

Delivered and Filed:   December 17, 2008

AFFIRMED

At approximately 9:30 p.m. on an August night, defendant lost control of the truck she was driving on Highway Loop 410. The truck eventually went airborne and landed on another vehicle. Of the five people in the other vehicle, two were killed and two were injured. Defendant was transported by EMS to Wilford Hall Hospital, where three blood draws were taken: (1) at 10:59 p.m. showing a blood alcohol content of .102; (2) at 12:15 a.m. showing a blood alcohol content of .07;

and (3) at 2:24 a.m. showing a blood alcohol content of .03.[1] Defendant was formally arrested at 1:07 a.m., after the first two blood draws and before the third draw.

Defendant pled guilty to two counts of intoxication manslaughter and two counts of intoxication assault, and the trial court assessed punishment at ten years' confinement, the sentences to run concurrently. Prior to entry of her plea, defendant filed a motion to suppress the blood test results and any testimony concerning the blood test results. The trial court denied the motion and this appeal ensued. We affirm.

### THE "FIRST LEGAL" AND "SECOND LEGAL" BLOOD DRAWS

In her first issue, defendant asserts the "first legal" blood draw was taken in violation of Texas Transportation Code section 724.012(b), which sets forth the circumstances under which a person's blood may be taken if the person has been arrested. *See* TEX. TRANSP. CODE ANN. § 724.012 (Vernon Supp. 2008). Defendant contends the "first legal" blood draw was taken before her arrest and, therefore, evidence of the draw should have been suppressed. In her second issue, defendant asserts the "second legal" blood draw was involuntary because Texas Transportation Code section 724.012(b) allows for only a single blood draw.

Section 724.012 does not apply when a person consents to having his or her blood drawn. *See Bennett v. State*, 723 S.W.2d 359, 361 (Tex. App.—Fort Worth 1987, no pet.) (whether defendant was under arrest when sample was taken is immaterial because there was no need to compel defendant's submission to the test because defendant consented to giving a blood sample). Here, the police officer who requested the blood draws while defendant was at the hospital testified

---

[1] In her brief, defendant characterizes these blood draws as follows: (1) the 10:59 p.m. draw as the "medical" blood draw, (2) the 12:15 a.m. draw as the "first legal" blood draw, and (3) the 2:24 a.m. draw as the "second legal" blood draw.

defendant consented to both the "first legal" and "second legal" blood draws. Nothing in the record contradicts the officer's testimony that defendant consented and nothing in the record supports defendant's contention on appeal that her consent was involuntary. Therefore, we overrule defendant's first and second issues.

## RULE 403: EXCLUSION OF RELEVANT EVIDENCE

In her third issue, defendant asserts the trial court erred in admitting results of the "first legal" and "second legal" blood draws into evidence because the probative value of the evidence was outweighed by the danger of unfair prejudice.

Texas Rule of Evidence 403 provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. When undertaking a Rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). We review the trial court's Rule 403 ruling for an abuse of discretion. *State v. Mechler,* 153 S.W.3d 435, 439 (Tex. Crim. App. 2005); *State v. Franco*, 180 S.W.3d 219, 225 (Tex. App.—San Antonio 2005,

pet. ref'd). We "should not reverse a trial judge whose ruling was within the zone of reasonable disagreement." *Mechler,* 153 S.W.3d at 440.

### A. Probative Value

Under the first factor, we examine "how compellingly the evidence serves to make a fact of consequence more or less probable." *Id.* Here, defendant's blood test results are evidence that she had consumed alcohol. As a result, the trial court could have reasonably concluded that the results of the "first legal" and "second legal" blood draws tended to make it more probable that defendant was intoxicated at the time of driving. *See id.*

### B. Need for the Evidence

Under the second factor, a proponent's need for a particular piece of evidence is reduced when the proponent "has other compelling or undisputed evidence to establish the proposition or fact." *Gigliobianco,* 210 S.W.3d at 641. Here, the police officer testified defendant admitted to him that she "had two beers," and he noticed that her eyes were bloodshot and watery. Because defendant was receiving treatment at the hospital, only two field sobriety tests were conducted: (1) the HGN test, which was consistent with intoxication and (2) the Vertical Nystagmus test, which was inconsistent with a high level of intoxication. Because the field tests were inconsistent, the State needed the results of the blood draws to establish intoxication. Thus, the trial court could have reasonably concluded that the State's need for the evidence weighed in favor of admissibility.

### C. Potential to Impress the Jury

The first counterfactor asks whether the evidence has the potential to impress the jury in an irrational way or suggest a decision on an improper basis. *Gigliobianco,* 210 S.W.3d at 641. "Rule 403 does not exclude all prejudicial evidence." *Mechler,* 153 S.W.3d at 440. Instead, the focus is

on whether the evidence is "unfairly prejudicial"; that is, whether it has a "tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *Id.*; *Franco*, 180 S.W.3d at 225. Here, defendant argues that admitting the results of her blood draws, which were below the legal limit, "would invite the jury to conduct its own extrapolation because there is no other evidence of intoxication that the State would present." The Texas Court of Criminal Appeals has rejected this argument. *Franco*, 180 S.W.3d at 225 (citing to *Stewart v. State*, 129 S.W.3d 93, 97 (Tex. Crim. App. 2004)). The results showing defendant consumed alcohol "relate[ ] directly to the charged offense." *Mechler*, 153 S.W.3d at 440-41. Thus, the trial court could have reasonably concluded that this factor weighs in favor of admissibility, and against defendant.

### D.     Confusion of Issues

The second counterfactor refers to a tendency to confuse or distract the jury from the main issues in the case. *Gigliobianco*, 210 S.W.3d at 641. "Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues." *Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007). Here, defendant was charged with intoxication manslaughter and intoxication assault. "Because the [blood draw] results relate directly to the charged offense, a jury could not be distracted away from the charged offense regardless of the required time to present the results." *Mechler*, 153 S.W.3d at 441. Therefore, the trial court could have reasonably concluded that this factor weighs in favor of admissibility, and against defendant.

### E.     Misleading the Jury & Undue Delay

"Misleading the jury," refers to a tendency of an item of evidence to be given undue weight by the jury that has not been equipped to evaluate the probative force of the evidence. "For example,

'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641. "Undue delay" and "needless presentation of cumulative evidence" focus on the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted, and "concern[s] the efficiency of the trial proceeding rather than the threat of an inaccurate decision." *Id.* On appeal, defendant does not mention these factors, nor argue they weigh against admissibility. Therefore, these factors should be considered as weighing in favor of admissibility.

**F.     Conclusion**

Considering all of the factors involved in the Rule 403 analysis, we conclude the trial court could have reasonably concluded that the probative value of the blood test results was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in allowing the results into evidence.

**RETROGRADE EXTRAPOLATION**

In her fourth issue, defendant asserts the State's expert opinion on retrograde extrapolation was not reliable because the State's expert, Rod McCutcheon, assumed certain facts in the case and then applied the science of retrograde extrapolation to his assumptions. Defendant does not assert McCutcheon was not qualified to perform retrograde extrapolation; she complains only that McCutcheon could not reliably apply the technique in her trial. Defendant contends McCutcheon had limited knowledge of defendant's individual characteristics, he did not know the manner in which the medical blood draw was analyzed, and his assumptions concerning whether defendant was in the absorption or elimination phase resulted in his opinion being unreliable.

"[T]he science of retrograde extrapolation can be reliable in a given case." *Mata v. State*, 46 S.W.3d 902, 916 (Tex. Crim. App. 2001). "The expert's ability to apply the science and explain it with clarity to the court is a paramount consideration." *Id.* "In addition, the expert must demonstrate some understanding of the difficulties associated with a retrograde extrapolation. He must demonstrate an awareness of the subtleties of the science and the risks inherent in any extrapolation. Finally, he must be able to clearly and consistently apply the science." *Id.*

When evaluating the reliability of a retrograde extrapolation, courts should also consider (1) the length of time between the offense and the test(s) administered; (2) the number of tests given and the length of time between each test; and (3) whether, and if so to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. *Id.* "These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking." *Id.*

However, "not every single personal fact about the defendant must be known to the expert in order to produce an extrapolation with the appropriate level of reliability." *Id.* If this were the case, no valid extrapolation could ever occur without the defendant's cooperation because many facts essential to the process are known only to the defendant. *Id.* "If the State had more than one test, each test a reasonable length of time apart, and the first test was conducted within a reasonable time from the time of the offense, then an expert could potentially create a reliable estimate of the defendant's BAC with limited knowledge of personal characteristics and behaviors." *Id.* "In

contrast, a single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant. Somewhere in the middle might fall a case in which there was a single test a reasonable length of time from the driving, and two or three personal characteristics of the defendant were known to the expert." *Id.* 916-17. "Suffice it to say that the factors must be balanced." *Id.* at 917.

McCutcheon, who is the chief toxicologist for the Bexar County Medical Examiner's Office, was able to explain retrograde extrapolation with sufficient clarity. He first explained the science of retrograde extrapolation as measuring the amount of alcohol in a person's blood at different times to determine a person's blood alcohol content at a past point in time. McCutcheon explained that alcohol consumed orally goes into the stomach, is absorbed into the blood stream, and then is distributed throughout the body. McCutcheon next explained that if blood concentration increases from one draw to the next, the body is absorbing the alcohol; however, if the concentration decreases, the body is eliminating the alcohol. McCutcheon also acknowledged the difficulties associated with retrograde extrapolation. He agreed that if only one blood draw was taken, blood concentration alone would be insufficient and additional information would be needed to determine whether a person was in the absorption phase or elimination phase. However, he stated multiple blood tests would indicate the rate at which a person metabolized the alcohol. When asked what he could determine from three blood tests, McCutcheon stated:

> Well, if you know when the blood was taken for each of those, then you can use that information as of what the alcohol concentration was at the three different times and see if there's a trend. And if there is a trend that shows that the alcohol concentration is being reduced over time, you can calculate the rate of elimination, or the rate of reduction.
>
> . . .

-8-

You could calculate their rate of elimination, and then apply that to the time frame between when the blood was taken and when the accident happened.

When asked whether "any kind of general numbers [were needed] to do that mathematical equation" "when you have only one blood test, and when there's an attempt to extrapolate backwards," McCutcheon answered:

> Yes. And what you're using is the range and rate of elimination that's been determined through many studies with alcohol to see what somebody that metabolizes at a slow rate would be. You have to use a range to estimate what somebody would have been [at] a previous time, because you don't know what their particular rate of elimination is.

We believe this testimony demonstrated McCutcheon had an understanding of the difficulties associated with a retrograde extrapolation and he was aware of the subtleties of the science and the risks inherent in any extrapolation.

McCutcheon's testimony next focused on the three blood draws taken from defendant. When asked for the result of the medical blood draw, McCutcheon responded that it was 120 milligrams per deciliter. When the State pointed out that this measurement was different from the legal definition of intoxication in Texas as being above .08, McCutcheon agreed that this measurement was "a different set of units in how to express the [blood alcohol content] measurement." Because a medical draw tests serum blood, as opposed to whole blood, McCutcheon explained the difference as follows:

> They do test serum or plasma in almost all cases in a hospital, because it's done on a clinical analyzer that requires that type of specimen . . . [and] traditionally they've used milligrams per deciliter, which is a hundred milliliters. So they're using milliliters instead of grams to express how much alcohol is present.
>
> . . .

If it is done on plasma or serum, the plasma and serum are essentially water, so the alcohol is going to be in the water, not in the cellular material, or very little of it is. So what happens is, you have a higher concentration in that serum and plasma, because the alcohol doesn't go into the blood cells, and so it's not distributed throughout the total volume like you would if you did a whole blood concentration.

. . .

So you have to do a conversion from serum plasma to whole blood to get the equivalent of what you would have if you did a whole blood analysis.

When asked if there was a mathematical formula that could be applied to the 120 milligrams in order to convert it to whole blood for the purpose of showing the alcohol content in whole blood, McCutcheon explained that serum plasma concentration is approximately eighteen percent higher, and based on that percentage, he calculated that the whole blood alcohol concentration for defendant would convert to 0.102. McCutcheon acknowledged there were various studies on the average rate of absorption, and studies of social drinkers indicated a range of 0.015 and 0.02, and he used 0.018 percent per hour. McCutcheon explained a range was necessary when you had only one test, because with only one test the individual's rate of elimination was unknown. But in a case with three separate tests, the person's rate of elimination could be calculated.

Based on the BAC results of the three draws taken from defendant, McCutcheon testified that defendant was in the elimination phase from the medical draw until the "first legal" draw, and between the "first legal" draw and the "second legal" draw. McCutcheon stated that multiple blood draws make it possible to calculate the rate at which a person is eliminating alcohol, and provided a more definitive rate of elimination. Based on defendant's rate of elimination taken from the three blood tests, McCutcheon opined that, if she "was in the post absorptive or elimination phase at the time of the incident," her BAC range would be .10 to .12 at 9:37 p.m.

On cross-examination, McCutcheon admitted he did not know when defendant entered the post absorptive phase or how many drinks she had consumed, although he thought he remembered being told she had consumed alcohol over a period of four to five hours before leaving the bar at approximately 8:44 p.m. McCutcheon also conceded defendant could have had a higher BAC at the time she was driving than at the time of the "first legal" draw; she could have had a lower BAC at the time she was driving than at the time of the "first legal" draw; and her BAC could have been the same both at the time she was driving and at the time of the "first legal" draw. Finally, he conceded it was "theoretically possible" that defendant "was almost alcohol free around 9:00 p.m. that night, and by 10:00 p.m. her alcohol level could have rose [sic] to a .10." Although McCutcheon did not have any information specific to defendant's characteristics or behavior, he said knowing these facts would not change his opinion about her BAC at the time of the incident. Instead, defendant's characteristics "would be a factor on how much she would have had to consume to get to that concentration."

In *Mata*, the Court of Criminal Appeals found that the retrograde analysis was unreliable because the inconsistencies in the expert's testimony prevented him from explaining the science with any clarity, there was only one test of Mata's BAC, which occurred over two hours after the alleged offense, and the expert did not know one single personal characteristic of Mata. *Mata*, 46 S.W.3d at 917. The State's expert apparently contradicted himself on the length of the absorption phase, Mata's probable BAC at the time of the stop, the number of drinks needed to increase from below a .10 to a .19 BAC, and the average elimination rate. *Id.* at 915. The absence of multiple tests, widely separated in time, removed a critical factor from the retrograde extrapolation analysis testimony introduced at trial. *Id.* at 917. Here, as in *Mata*, McCutcheon did not know any

significant characteristics about defendant. However, unlike in *Mata*, McCutcheon had three tests over a reasonable span of time on which to base his opinion. The medical draw occurred ninety minutes after the incident, the "first legal" draw occurred seventy-five minutes later, and the "second legal" draw occurred about two hours later. On appeal, defendant does not contend the medical blood draw was taken an unreasonable amount of time after the incident.[2] Although McCutcheon's testimony may have contained some inconsistencies, none were as glaring as in *Mata*. Based on the record as a whole, we cannot conclude the trial court's decision was outside the reasonable zone of disagreement; therefore, the trial court did not abuse its discretion in determining McCutcheon's opinion was reliable.

## OTHER COMPLAINTS REGARDING THE BLOOD DRAWS

In her fifth issue, defendant asserts the medical blood draw should have been suppressed because it was not taken by a person qualified to do so under Transportation Code section 724.017. Although defendant concedes a medical blood draw is not required to meet the standards set forth in section 724.017, she argues that section 724.017's requirements are necessary to ensure the reliability of results from any draw if those results are to be used against a criminal defendant, including medical blood draws. In her sixth and final issue, defendant asserts the medical blood draw and the "first legal" blood draw were taken without her consent and, therefore, constituted an assault. Our review of the record reveals that when the trial court and counsel began a discussion

---

[2] *See Mata*, 46 S.W.3d at 916 ("If the State had more than one test, each test a reasonable length of time apart, and the first test was conducted within a reasonable time from the time of the offense, then an expert could potentially create a reliable estimate of the defendant's BAC with limited knowledge of personal characteristics and behaviors."); *Owens v. State*, 135 S.W.3d 302, 309 n.3 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("One of the indisputable concepts in retrograde extrapolation is that multiple tests – the more time between the tests the better – allow the expert to determine whether a person is absorbing or eliminating alcohol, and thereby more accurately and reliably determine that person's BAC at the time of the offense.").

of these two objections, the court stated, "So we'll just reserve the medical issue until . . . the week of trial." The objections to the medical draw were not again raised. The assault complaint also was not pursued to a ruling. Therefore, defendant's fifth and sixth issues were not preserved for review.

## CONCLUSION

We overrule defendant's issues on appeal and affirm the trial court's judgment.


Sandee Bryan Marion, Justice


PUBLISH