

# IN THE
# TENTH COURT OF APPEALS

### No. 10-08-00413-CR

**EMMITT DOUGLAS CARROLL,**

                                                            **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                            **Appellee**

---

### From the 361st District Court
### Brazos County, Texas
### Trial Court No. 07-05908-CRF-361

---

## MEMORANDUM  OPINION

---

A jury found Appellant Emmitt Douglas Carroll guilty of the offense of aggravated robbery.  The trial court assessed his punishment at fifty-eight years' imprisonment.  In two issues, Carroll appeals.  We will affirm.

### BACKGROUND

On September 17, 2007, at about 2:00 a.m., Patricia Garcia took her husband to work and then returned to her apartment complex in Bryan, Texas.  She parked her vehicle in the parking lot, got out, and opened the back door of the vehicle to get her

two-year-old daughter out of the backseat. At that time, she heard a rustling in the bushes, someone say "go, go, go," and then a gun cocking. She then saw a man with a silver gun coming out of the darkness toward her. He was wearing a light-colored shirt that looked like an undershirt, baggy blue jeans or blue jean shorts, white tennis shoes, and a red bandana around his neck to cover his face. Once the man was standing in front of her, he said, "I don't want to hear nothing." At that point, Garcia's daughter saw the man and said, "No." The man then "kind of backed away a little." He asked Garcia for her purse. Garcia pulled the purse out from under the seat, and the man took it out of her hands. He also asked for her phone. She replied that it was in the purse. He looked inside the purse and then started to leave.

By about 2:15 or 2:18 a.m., Garcia got back inside of her apartment and sent a message to her husband on the computer. When she spoke to the police, she described the man who robbed her as a young, very clean-cut African-American man who was about five feet two inches tall and weighed about 150 pounds. She also stated that she is not very good at heights and weights. At trial, she identified Carroll as the man who had robbed her.

Also in the early morning hours of September 17, 2007, Erik Scheets returned to his apartment complex in College Station, Texas. Between 2:30 and 3:00 a.m., he pulled into a parking spot and saw three African-American men standing about twenty to thirty feet away. When he got out of his car, the men were walking toward him. Scheets began walking toward his apartment, greeted the men, and continued walking past them. But just after Scheets passed by the men, he heard the sound of a gun

cocking, and one of the men yelled for him to stop. Scheets stopped and turned around. The men were standing "kind of in a triangle, two behind one." The man directly in front of him was holding a small silver semi-automatic handgun.

The man with the gun told Scheets to give them his wallet and cell phone. Scheets complied, and the man looked through the wallet. Meanwhile, the other two men went through Scheets's car and took a laptop, an ipod, and several other things from the trunk. When the man with the gun discovered that Scheets did not have any money in his wallet, he told Scheets to get back into his car so that he could go get the man some money. Scheets and the man with the gun then got into the car, and the man told Scheets to drive to the nearest ATM.

As they were leaving the parking lot, a police car passed them, and the man told Scheets not to try anything and pressed the gun into Scheets's ribs. Once at the ATM, Scheets tried several times to get money out of the machine but was unsuccessful because he did not have much money in his account. The man eventually told Scheets to go back to his apartment. Once Scheets returned to the apartment complex where the other two men were waiting, the man with the gun told Scheets that because he could not give him any money, the three men were going to go with Scheets to his apartment and "get their money's worth."

After Scheets unlocked the door to his apartment, the men told him to sit on the couch. The man with the gun handed it to one of the other men, who watched Scheets while the other two men went through the different rooms of the apartment. At some point, the two men returned to the living room. The man who had originally held the

gun took the gun back, held it to Scheets's head, and asked Scheets if they had gotten everything of value. They then told Scheets not to call the police and not to try and leave because they would be waiting. They then left.

Several minutes later, Scheets left through the sliding glass door because the men had taken his cell phone, and he was unable to call the police. Scheets flagged down a passing motorist who helped him. Scheets described to the police that the man holding the gun was approximately six feet tall, had a muscular build, and was wearing a white tank top and baggy gray shorts; his hair was cut short, and he was wearing a "do-rag" on his head. The man who watched him while they were in the apartment had a slender build and was wearing plaid shorts. Scheets testified that he also described the third man as wearing a dark shirt, a cross necklace, and a red bandana.

Upon hearing of the robbery, a cashier at a Valero gas station on the same street as Scheets's apartment complex informed a friend, who then told the police, that she had seen three African-American men in the store around 11:30 p.m. on the same night as the robbery. They had made her nervous because they were acting "crazy," laughing, cutting up, and "smelled funny." She recognized one of the men as Damian, a regular customer from another store where she had previously worked, and one of the other men identified himself as "AJ" or "EJ." The police recovered the in-store video from that night.

Detective Patrick Massey of the College Station Police Department testified that he reviewed the video from the store, and the appearances of the three men in the video were consistent with the descriptions that Scheets had given him on the night of the

robbery. In particular, one of the men who had robbed Scheets wore a red bandana, and one of the men on the video had a red bandana tucked away in his pocket. Detective Massey thus contacted Scheets to review the video. After reviewing the video, Scheets identified the three men as those who had robbed him. The man in the video who identified himself as "EJ" is Carroll. The other two individuals are Damian Flowers and Milton McCloud. At trial, Scheets identified Carroll as the man that held the gun, made him drive to the ATM, and then took him back to his apartment.

Carroll was convicted of the aggravated robbery of Scheets.

## ADMISSION OF EXTRANEOUS OFFENSE

In his first issue, Carroll contends that the trial court abused its discretion by admitting the extraneous offense evidence of the Garcia robbery under the identity exception of Rule 404(b) of the Texas Rules of Evidence. We will uphold the decision of the trial court concerning the admissibility of the evidence unless the ruling rests outside the zone of reasonable disagreement. *See Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).

In *Segundo v. State*, 270 S.W.3d 79 (Tex. Crim. App. 2008), the Court of Criminal Appeals stated:

> The general rule is that the defendant is to be tried only for the offense charged, not for any other crimes or for being a criminal generally. However, evidence of extraneous acts of misconduct may be admissible if (1) the uncharged act is relevant to a material issue in the case, and (2) the probative value of that evidence is not significantly outweighed by its prejudicial effect. Because the propensity to commit crimes is not a material fact in a criminal case, Rule 404(b) explicitly prohibits the admission of uncharged acts to prove conduct in conformity with a bad character.

One of the main rationales for admitting extraneous-offense evidence is to prove the identity of the offender. Here, the theory of relevancy is usually that of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that they constitute a "signature." Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual. No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person. But if the similarities are "generic," *i.e.*, typical to this type of crime, they will not constitute a "signature" crime. Sometimes, however, the "signature" is one unique characteristic. For example, suppose that three bank robberies are committed over a four-year period in different cities in which the robber used an antique silver crossbow. This scenario is so unusual that it is highly likely that each robbery was committed by the same person using the same antique silver crossbow. This is "the mark of Zorro" mode of proving identity; it is a remarkably unusual fact, in which a single detail suffices to establish identity.

*Id.* at 71 (footnotes and citations omitted).

In this case, the trial court allowed the State to present extraneous offense evidence of the Garcia robbery only for the purpose of determining the identity of the offender. Although Carroll does not dispute that he raised the issue of identity at trial, he argues that the trial court's admission of the extraneous offense evidence was error because the pattern and characteristics of the charged crime and the uncharged conduct were not significantly similar such that they constituted a "signature." We disagree.

The extraneous offense presented by the State was committed in close proximity to the time and place of the charged offense and by a common mode of commission. *See Dickson v. State*, 246 S.W.3d 733, 742 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) ("[T]he Court of Criminal Appeals has held that extraneous offenses may be sufficiently

similar to prove identity where there is either proximity in time and place *or* a common mode of committing the offense.") (citing *Ransom v. State*, 503 S.W.2d 810, 813 (Tex. Crim. App. 1974)). Both robberies were committed in the Bryan/College Station area within an hour of each other on the morning of September 17, 2007. In both robberies, a clean-cut African-American male approached the victims on foot just after they had exited their vehicles in the parking lots of their respective apartment complexes. Both victims heard the sound of a gun cocking just before they saw a man with a silver gun. Both victims saw a red bandana. In both robberies, the man with the gun immediately asked for the victims' purse/wallet and also took the victims' cell phones. Finally, both victims identified Carroll as the man that held the gun on them and robbed them.

Carroll argues that although there were some similarities between the charged offense and the extraneous offense, the incidents were also dissimilar. For instance, Carroll states that the Garcia robbery involved only one black male while the Scheets robbery involved three black males. But Garcia testified that she heard a rustling in the bushes and someone say "go, go, go," just before the man approached her with a gun. This indicates that more than one person was involved in her robbery as well. Furthermore, some dissimilarities between the charged crime and the extraneous offense do not automatically make the extraneous offense inadmissible. *Dickson*, 246 S.W.3d at 743; *see Ransom*, 503 S.W.2d at 813-14. We conclude that the trial court did not abuse its discretion in finding that the offenses were sufficiently similar such that evidence of the extraneous offense was admissible to prove the issue of identity.

In his first issue, Carroll also argues that even if the trial court did not err in admitting the extraneous-offense testimony under Rule 404(b), the evidence should have been excluded under Rule 403 because the prejudicial effect of the evidence significantly outweighed its probative value. Under Rule 403, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

> In its seminal decision in *Montgomery v. State*, the Court of Criminal Appeals identified four non-exclusive factors to be considered in determining whether evidence should be excluded under Rule 403. 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1991) (op. on reh'g). Those factors were: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; and, (4) the proponent's need for the evidence. *See id.* (citing 22 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5250, at 545-51 (1978); EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE §§ 2:12, 8:03, 8:07 (1984)); *accord Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005).

> More recently, the Court has looked to the language of Rule 403 and restated the pertinent factors.

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

> *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnotes omitted); *accord Subirias v. State*, 278 S.W.3d 406, 408 (Tex. App.—San Antonio 2008, pet. ref'd); *Brock v. State*, 275 S.W.3d 586, 590 (Tex. App.—Amarillo 2008, pet. ref'd); *Stafford v. State*, 248 S.W.3d 400, 411-12 (Tex. App.—Beaumont 2008, pet. ref'd); *but see De La Paz* [v. State], 279 S.W.3d [336, 349 (Tex. Crim. App. 2009)] (applying *Montgomery* factors).

*Newton v. State*, 301 S.W.3d 315, 319 (Tex. App.—Waco 2009, pet. ref'd) (footnote omitted).

*Probative force of the evidence*: As discussed above, the extraneous-offense evidence of the Garcia robbery is probative because it assists the jury in determining the identity of the offender in the charged offense. This factor weighs in favor of admissibility.

*Proponent's need for that evidence*: Carroll argues that the State did not need the extraneous-offense evidence of the Garcia robbery to establish identity because Scheets positively identified Carroll at trial as the man who had held the gun when he was robbed. But the defense attacked Scheets's identification during cross-examination by questioning him about differences in descriptions of the perpetrators' clothing. Further, during his opening statement and closing argument, Carroll argued that the evidence did not support a finding that he was the individual who robbed Scheets.

When identity is "a hotly contested issue," the State's need to offer evidence of an extraneous offense is strong. *Karnes v. State*, 127 S.W.3d 184, 193 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing *Lane v. State*, 933 S.W.2d 504, 520-21 (Tex. Crim. App. 1996)). In this case, identity was the seminal issue in dispute at trial. This factor thus weighs in favor of admissibility.

*Tendency of evidence to suggest a decision on an improper basis*:  In *Lane*, the Court of Criminal Appeals provided:

> As for the potential to irrationally impress the jury, it is true that an extremely similar extraneous offense always carries the potential to impress the jury of a defendant's character conformity, an impression the law seeks to avoid.  However, the impermissible inference of character conformity can be minimized through a limiting instruction.

933 S.W.2d at 520.  Here, the trial court gave a limiting instruction to the jury, ordering them to consider Garcia's testimony only for the purpose of determining the identity of the offender in the charged offense.  Thus, the extraneous-offense evidence had limited potential to impress the jury in an irrational way.  This factor does not weigh in favor of exclusion of the evidence.

*Jury confusion or distraction, undue weight, and amount of time or repetition*:  These factors concern whether presentation of the evidence consumed an inordinate amount of time or was repetitious, and the evidence's tendency to confuse or distract the jury or to cause the jury to place undue weight on its probative value.  *See Gigliobianco*, 210 S.W.3d at 641-42; *Newton*, 301 S.W.3d at 320.  Garcia's testimony about her robbery was only about thirty pages of the reporter's record.  It was not repetitious, and we do not believe that it could cause jury confusion or distraction or cause the jury to give it undue weight, especially since the trial court gave a limiting instruction to the jury.  All of these factors thus favor admission.

Rule 403 "envisions exclusion of [relevant] evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'"  *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v.*

*State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). We cannot say that there is a "clear disparity" between the danger of unfair prejudice posed by the extraneous-offense evidence and its probative value. Thus, the trial court did not abuse its discretion by overruling Carroll's Rule 403 objection. We overrule Carroll's first issue.

## *BATSON* CHALLENGE

In his second issue, Carroll contends that the trial court erred in overruling his *Batson* challenge because the State used its peremptory challenges to eliminate all African Americans from the jury panel and did not give racially neutral explanations for the challenges.

The exclusion of a venire-member based on race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. U.S. CONST. amend. XIV; *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race. *Snyder v. Louisiana*, 552 U.S. 472, 476, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008). First, the defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race. *Snyder*, 552 U.S. at 476, 128 S.Ct. at 1207; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). Second, once the *prima facie* showing has been made, the burden of production shifts to the State to articulate a race-neutral reason for its strike. *Snyder*, 552 U.S. at 476, 128 S.Ct. at 1207; *Watkins*, 245 S.W.3d at 447. Third, if the State tenders a race-neutral explanation, the trial court must then decide whether the defendant has

proved purposeful racial discrimination. *Snyder*, 552 U.S. at 476, 128 S.Ct. at 1207; *Watkins*, 245 S.W.3d at 447.

If the opponent of a challenged strike raises a question of purposeful discrimination, and the trial court proceeds immediately to the State's race-neutral reasons for the strike, a reviewing court assumes that the opponent has satisfied the first step of the *Batson* process. *Watkins*, 245 S.W.3d at 447. The second step of the process does not demand an explanation that is persuasive, or even plausible. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). The issue is the facial validity of the prosecutor's explanation. *Id.* Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Id.*

It is not until the third step that the persuasiveness of the justification tendered for the strike becomes relevant. *Id.* "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* In evaluating the genuineness of the State's proffered race-neutral reasons, we may consider: (1) whether the reason given is related to the facts of the case; (2) whether the State meaningfully questioned the challenged venire member; (3) whether persons with the same or similar characteristics as the challenged venire member were not struck; (4) whether there was disparate examination of the members of the venire; and (5) whether an explanation was based upon a group bias although the specific trait is not shown to apply to the challenged juror. *Williams v. State*, 804 S.W.2d 95, 105-06 (Tex. Crim. App. 1991).

In Carroll's case, the venire included four African Americans. Carroll used a peremptory strike to remove one of the African Americans from the venire, and the State used its peremptory strikes to remove the remaining three African Americans from the venire. Carroll made a *Batson* challenge, objecting that the State had struck the three African-American members of the venire, Nos. 8, 10, and 23, on the basis of race. The trial court asked the State for its race-neutral reasons for the strikes. The State responded that it struck Nos. 8 and 10 because they were "very talkative" and "had a lot of questions." No. 10 specifically had a lot of questions about the possibility that the weapon used in the offense was not real. Additionally, the State said that it struck No. 8 because he was only twenty-four years old and had been employed for less than nine months. As to No. 23, the State stated that it struck him because he was only twenty-six years old and because he "just never talked."

Carroll then cross-examined the prosecutor. The prosecutor testified that it was not unusual to have some panel members who did not speak much, and he admitted that there were a number of venire-members in this case who did not speak much. Accordingly, he stated that he did not strike anyone solely for their lack of talking but that it was a consideration in his striking of three non-African-American venire-members. The prosecutor also testified that a "big factor" in striking Nos. 8 and 23 was their age. He said age was not a factor for No. 10 because he was thirty-seven. However, he was "so talktive [sic], asked so many questions about issues of aggravated robbery, how it can and can't be committed." The prosecutor also stated that No. 10's

employment for only seven months was a reason for the strike even though the State did not question any of the venire-members about employment.

Carroll argued that "there are a number of people in a similar situation that were not struck similarly by the State in this case." He conceded that he understood why the State would have concerns about No. 10, but he stated that No. 8 appeared to be a fairly strong juror for the State. The trial court found that the State had provided race-neutral reasons for striking the venire-members, and it overruled Carroll's objection.

We will begin with No. 10. If a defendant creates the impression that he is abandoning an objection, he waives the right to complain of that alleged error on appeal. *See Purtell v. State*, 761 S.W.2d 360, 366 (Tex. Crim. App. 1988). Here, Carroll abandoned his *Batson* challenge to the State's strike of No. 10 after the State gave its race-neutral reason for the strike. Just before the trial court made its ruling, defense counsel specifically stated: "I agree with regards to . . . Juror No. 10. He was extremely talktive [sic], and I can understand the State having some concerns about putting somebody on the panel who asked what about the gun, maybe it wasn't a gun, that kind thing." Thus, Carroll failed to preserve his *Batson* challenge as to No. 10. *See id.*

As for Nos. 8 and 23, we will assume that Carroll satisfied his step-one obligation to make a *prima facie* case of purposeful discrimination. *See Watkins*, 245 S.W.3d at 447. Furthermore, Carroll does not dispute that the State offered race-neutral explanations for striking Nos. 8 and 23. *See Partida v. State*, 133 S.W.3d 738, 742 (Tex. App.—Corpus Christi 2003, no pet.) ("Youth and employment (or lack thereof) are acceptable race-neutral explanations for striking a prospective juror."). Instead, Carroll's focus is on

what he considers to be the State's inconsistent reasons for striking potential jurors. Specifically, Carroll complains that the State struck Nos. 8 and 10 in part because they were talkative but then struck No. 23 in part because he never talked. Carroll also complains that the State struck Nos. 8 and 23 in part because of their young age but then stated that it struck No. 10 in part because he was "over 30."

First, the only discussion about No. 10's age occurred in the following exchange:

> [Defense counsel]: And you said that you struck -- in particular you struck . . . No. 8, No. 10, and No. 23 in large part because of their age, is that right?

> [Prosecutor]: That's a big factor, yes. Well, not on . . . No. 10, because he's 37 years old. The fact on him was, first of all, the fact he was so talktive [sic], asked so many questions about issues of aggravated robbery, how it can and can't be committed, and the fact that he's been employed for seven months.

Thus, the State clarified that it did not actually strike No. 10 because of his age. Furthermore, a trial court's decision on whether the defendant has proved a *Batson* claim turns, in part, on observations made during the voir dire examination. Therefore, the court's determination of a *Batson* issue must be accorded great deference on appeal. *King v. State*, 129 S.W.3d 680, 682 (Tex. App.—Waco 2004, pet. ref'd). The trial court's finding that peremptory strikes were not racially motivated will be upheld on appeal if the finding is not "clearly erroneous" when viewed in the light most favorable to that ruling. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).

Given the record before us, we cannot conclude that the trial court's denial of Carroll's *Batson* objection was clearly erroneous. We overrule Carroll's second issue.

**CONCLUSION**

Having overruled both of Carroll's issues, we affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Reyna, and
      Justice Davis
Affirmed
Opinion delivered and filed December 15, 2010
Do not publish
[CRPM]

\*(Chief Justice Gray concurs in the judgment of the Court affirming Carroll's conviction. A separate opinion will not issue. He notes, however, that he does not find that the characteristics of this crime and the extraneous offense are sufficiently "unusual or idiosyncratic" to make them the "signature" for the manner in which Carroll commits his armed robberies. *Owens v. State*, 827 S.W.2d 911, 914-15 (Tex. Crim. App. 1992) and *Taylor v. State*, 920 S.W.2d 319, 321-22 (Tex. Crim. App. 1996), respectively. What must be shown to make the evidence of the extraneous offense admissible is something that sets it apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime. *Ford v. State*, 484 S.W.2d 727, 730 (Tex. Crim. App. 1972). He concurs because he finds the error harmless. As to the *Batson* issue, he finds he must agree with the Court's holding under the "clearly erroneous" standard of review. *Grant v. State*, No. PD-1059-09, 2010 Tex. Crim. App. LEXIS 1566, \*2-3 (Tex. Crim. App. Nov. 17, 2010). But how strange it is that the race neutral reason given can be another classification with similar protections as race and gender; that being age. And it is also ironic that the race-neutral reason given beyond age is that one prospective juror talked too much and the other talked too little. This case presents a compelling exhibit for the Honorable Levi Benton's argument to eliminate preemptory strikes. If we fail to limit the improper use of preemptory strikes by striking down only the most egregious examples of race and gender discrimination, I fear we endanger the very existence of this powerful tool for jury selection in Texas.)